## HILL, JR., ET AL. *v.* WALLACE, SECRETARY OF AGRICULTURE, ET AL.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 616. Argued January 11, 12, 1922.—Decided May 15, 1922.

1. Members of an incorporated board of trade have standing to maintain a bill against its president and directors to restrain them from complying with an unconstitutional act of Congress threatening seriously to impair the value of the board to its members and the value of their memberships, when the directors have refused to bring the suit for fear of antagonizing government officials. P. 60.

2. Section 3224 of the Revised Statutes forbidding suits to restrain collection of a tax *held* inapplicable to this case because of its exceptional and extraordinary circumstances. P. 62. *Dodge* v. *Brady,* 240 U. S. 122.

3. The Act of August 24, 1921, c. 86, 42 Stat. 187, known as the Future Trading Act, is in purpose, in essence and on its face a regulation of the business of grain boards of trade, with a heavy penalty, called a tax, imposed on sales of grain for future delivery to coerce boards and their members into compliance with the regulations, and, therefore, it cannot be sustained as an exercise of the taxing power of Congress, insofar as concerns this so-called tax and the regulations related to it. P. 66. *Child Labor Tax Case, ante,* 20.

4. Neither are the tax and related regulations sustainable under the Commerce Clause. P. 68.

5. Sales of grain for future delivery made at Chicago between the members of a board of trade, to be settled there by off-setting purchases or by delivery of warehouse receipts for grain there stored, are not in themselves interstate commerce and cannot come within the regulatory power under the Commerce Clause unless they are regarded by Congress, from the evidence before it, as

directly interfering with interstate commerce so as to obstruct or burden it. P. 68.

6. A direction in an act that, if any of its provisions or the application thereof to any person or circumstance be held invalid, the validity of the remainder of the act or the application of such provision to other persons and circumstances shall not be affected, is an assurance that separable valid provisions may be enforced consistently with legislative intent, but does not and cannot empower the courts to amend inseparable provisions of the act by inserting limitations which it does not contain. P. 70.

7. Under § 11 of the Future Trading Act, *supra*, directing severance of valid from invalid provisions and applications, § 9, which authorizes investigations by the Secretary of Agriculture, and, *semble*, § 3, imposing a tax on certain kinds of options of purchase or sale of grain, are unaffected by the conclusion that § 4, imposing the tax on sales for future delivery, and the regulations interwoven with it in subsequent sections, are invalid. P. 71.

Reversed.

This is a suit attacking the validity of the Future Trading Act, approved August 24, 1921, c. 86, 42 Stat. 187. The act imposes a tax of 20 cents a bushel on all contracts for the sale of grain for future delivery, but excepts from its application sales on boards of trade designated as contract markets by the Secretary of Agriculture, on fulfillment by such boards of certain conditions and requirements set forth in the act.

The bill is filed by eight members of the Board of Trade of the City of Chicago, who sue in behalf of all other members of that body who may wish to join and share in the relief granted, against the Secretary of Agriculture, the Commissioner of Internal Revenue, the United States District Attorney for the Northern District of Illinois, the Collector of Internal Revenue for the first district of that State, the Board of Trade of the City of Chicago, its president, vice-presidents and directors. The bill avers that the appellants applied to the Directors of the Board of Trade to institute a suit to have the Future Trading Act adjudged unconstitutional before they should comply with

it, but the Board of Directors refused to take any steps, and announced that they intended to comply with the provisions of the act; that the Board refused because they feared to antagonize the public officials whose duty it was to construe and enforce the act, and the complainants feared that, acting under the coercion imposed upon them by the act, the Board of Directors would admit to membership on the Board the representatives of the coöperative associations of producers; that the Secretary of Agriculture would designate such Board as a contract market, and that such action by the Board of Directors would cause irreparable injury to the complainants and all the other members of the Board. Complainants set out the character of the Board of Trade of Chicago and its organization as a corporation under a special charter of the State of Illinois in 1859, by which certain persons engaged in the purchase and sale of grain were created a corporation and given power to admit members, and expel them, to adopt regulations and by-laws for the management of the business and the mode in which it should be transacted; to appoint committees of arbitration for the settlement of differences between the members; to appoint persons to examine, measure, weigh, gauge, inspect, grain and other articles of produce, with authority to issue a certificate as to quality or quantity; and to make the brand or mark thereof evidence between any buyer and seller assenting to the employment of such person, and to do and carry on business usual in the management of boards of trade.

The bill avers that the Board has 1610 members, of whom the complainants are members in good standing; that its memberships are salable for more than $7,000 apiece; that in recent years there have been organized in most of the grain-producing States, among so-called farmers, coöperative societies who desire to market their crops at actual cost and to market them through the exchanges

at actual cost, and without paying the commissions charged by the members of such exchange; the plan being to sell all grain through an authorized member of such organization admitted to the exchange who shall charge the prescribed commission and ultimately rebate back to the members of such organization the aggregate of such commissions after paying his salary and incidental expenses, on the basis of the number of bushels of grain which each producer has sold through said organization; that the admission of such representatives of coöperative societies to the Chicago Board of Trade would destroy the business of its members, and the value of the memberships, and make it difficult for the Board to maintain sufficient members to pay the assessments to meet the expenses of its maintenance; that many of its members engage in making contracts with other members for the purchase and sale of grain for future delivery; that during the years from 1884 to 1913, wheat of the grade contemplated in the contracts for future delivery on the Board sold as low as 48⅞ cents per bushel, and never for more than $2.00 per bushel; and that during most of said time its price was below $1.00; that during the same years corn sold as low as 19½ cents a bushel, and never higher than $1.00, and most of the time sold below 60 cents; that oats sold as low as 14¾ cents per bushel and never higher than 62½ cents, and much the greater part of said period under 40 cents per bushel; that, at the time of the filing of the bill, contract wheat was selling for $1.05 per bushel, and that no member of the Board could afford to make contracts for future delivery and pay the tax thereon imposed by the Future Trading Act of 20 cents a bushel; that the law in effect prohibits all those who are not members of a board of trade, which has been designated by the Secretary of Agriculture a contract market under said act, from making any contracts of sales for future delivery.

The bill charges that the Future Trading Act violates the Constitution of the United States (1) in depriving the members of the Board of their property without due process of law, in the compulsory admission to membership on said board of representatives of the coöperative associations of producers, in accord with § 5 of the act; (2) in that it attempts to regulate commerce, which is not commerce with foreign governments or among several States, but is commerce wholly between persons contracting within the State of Illinois respecting the purchase or sale of grain which forms a part of the common property of that State, and is intrastate and not interstate; (3) in that it violates the Tenth Amendment to the Constitution, by interfering with the right of the State of Illinois to provide for and regulate the maintenance of grain exchanges within its borders upon which are conducted the making of contracts which are merely intrastate transactions.

The bill avers the complainants are not in collusion with defendants or any of them to confer on a court of the United States jurisdiction of a cause of which it would not otherwise have jurisdiction; and that the amount involved in the matters in dispute is, exclusive of interest and costs, more than $3,000.

The decrees prayed for are:

To enjoin the Secretary of Agriculture from taking any steps to induce or compel the Board of Trade or its directors to comply with the provisions of the act;

To enjoin the Commissioner of Internal Revenue, the Collector of Internal Revenue and the District Attorney named as parties from attempting to collect by suits or prosecutions, or otherwise, any tax, penalty or fine, under the act; and

To enjoin the Board of Trade and each of its officers and directors from applying to the Secretary of Agriculture to have the Board designated as a contract market

under the act, and from admitting to membership into such board any representative of any coöperative association of producers in compliance with § 5 of the act, or from taking any other steps to comply with the act.

The Board of Trade and its president, its officers and directors moved to dismiss the bill of complaint on the ground that it was without equity on its face and did not state facts sufficient to constitute a cause of action in a court of equity.

The Secretary of Agriculture appeared specially to move the court to dismiss the suit as to him because he was not a resident of the Northern District of Illinois and had not been served with process, and the court had no jurisdiction over him.

The United States Attorney for the Northern District of Illinois, and the Collector of Internal Revenue, moved the court to dismiss on the grounds that the suit was to restrain the collection of a tax contrary to § 3224 of the Revised Statutes; and that the bill sought to restrain the enforcement of a criminal statute without showing that the complainants suffered irreparable injury. The District Court denied the motion for a temporary injunction and ordered that the bill be dismissed as to all the defendants for want of equity.

*Mr. Henry S. Robbins* for appellants.

The provision of the Future Trading Act (§ 5–e) requiring the exchange to admit to membership any duly authorized representative of a coöperative association of producers, and sanctioning "patronage dividends," deprives the Board of Trade and its members of their property without due process of law.

The provisions which aim to regulate boards of trade are not within the commerce power of Congress.

Congress by the title has said that parts of this act are not the exercise of the taxing power, and has left this

9545°—23——4

court free to treat as the exercise of the commerce power those provisions which are clearly regulatory in character.

The question whether the provision of § 5–e which modifies the commission rule of thè exchange in the interest of coöperative associations of producers is within the commerce power is answered in the negative in *Hopkins* v. *United States,* 171 U. S. 578.

All contracts for future delivery of grain made by or through members of this Board are made in its exchange room in Chicago during certain market hours only, and the only parties to these contracts are members then and there present. Less than one-quarter in volume of these contracts are performed by delivery, and upon such contracts the delivery is of warehouse receipts entitling the holders to receive a specified number of bushels of grain of a particular grade out of a larger common mass in store. These receipts on their face state that the grain, for which they are issued, has been mixed with other grain of the same grade; and when the receipt holder calls for his grain, the warehouseman, to comply with the state law, makes delivery out of the grain that has been longest in store. If any component parts of the common mass of grain out of which the receipt is filled have come from other States, they have completely lost their interstate character by this inter-mixing. Such contracts for the future delivery of grain are not interstate commerce. *Ware & Leland* v. *Mobile County,* 209 U. S. 405. See also *Engel* v. *O'Malley,* 219 U. S. 139; *New York Life Insurance Co.* v. *Deer Lodge County,* 231 U. S. 495, 511; *Hopkins* v. *United States,* 171 U. S. 578; *Brown* v. *Maryland,* 12 Wheat. 419; *May* v. *New Orleans,* 178 U. S. 496; *Austin* v. *Tennessee,* 179 U. S. 343; *Purity Extract Co.* v. *Lynch,* 226 U. S. 192; *Weigle* v. *Curtice Bros. Co.,* 248 U. S. 285; *Public Utilities Commission* v. *Landon,* 249 U. S. 236; *Mutual Film Corporation* v. *Ohio Industrial Commission,* 236 U. S. 230; *Askren* v. *Continental Oil Co.,* 252 U. S. 444.

Contracts which by their terms contemplate the shipment of grain across state lines are, of course, interstate commerce. But the purpose or intention of some of the purchasers in this future trading upon this exchange to ship out of the State property they purchase does not make their contracts for future delivery made in these " pits " interstate contracts. And if one such contract is not, a large number of such contracts do not constitute interstate commerce. *United States* v. *Knight Co.,* 156 U. S. 1, 13; *Coe* v. *Errol,* 116 U. S. 517; *New York Central R. R. Co.* v. *Mohney,* 252 U. S. 152; *Arkadelphia Milling Co.* v. *St. Louis S. W. Ry. Co.,* 249 U. S. 134, 151; *Bacon* v. *Illinois,* 227 U. S. 504, 516; *Merchants Exchange* v. *Missouri,* 248 U. S. 365; *Hammer* v. *Dagenhart,* 247 U. S. 251; *Crescent Oil Co.* v. *Mississippi,* 257 U. S. 129. All this future trading, therefore, should be regarded as intrastate commerce, the regulation of which is not within the commerce power of Congress.

We have here a non-profit corporation created by a State, which does no business itself and whose chief function is to furnish in Chicago an exchange hall where its members individually may conveniently and economically transact business. To that end it provides for the admission as members of only such persons as seem to it to be fit in point of character and financial responsibility, it provides a method by which members, who default on their contracts or otherwise misbehave, may be suspended or expelled, it provides rules respecting the terms of the contracts made by its members in the absence of express stipulations to the contrary, it provides arbitration committees to decide the business disputes of its members, and it promulgates and enforces rules to control the business relations of its members to each other and to the exchange itself. Should all these be treated as together constituting an instrumentality, which is but an aid to commerce?

Much the larger part of the trading between members in the exchange hall is so-called future trading, which, as already shown, is not interstate commerce. Another substantial part of the trading in the exchange hall is that of members who, as agents, receive grain on consignment to sell and account for the proceeds or buy grain as agents which, so far as the business of these agents is concerned, has been held by this court not to be interstate commerce. The bidding for, or offering, grain by letters or telegrams sent by members is in no sense a part of the trading on the exchange. Hence, if any, only a minor part of the total volume of trading on this exchange possesses any of the characteristics of interstate commerce.

From the foregoing facts does not the conclusion arise that the maintaining of this exchange hall—and everything that the Board does in connection therewith—lacks any element of interstate commerce within the definition that this court has frequently given to that term? Hence, is not Congress without power to regulate this exchange? Such seems to have been the practical construction of state and federal legislators for more than one hundred years prior to the passage of the Future Trading Act. *Hopkins* v. *United States*, 171 U. S. 578, seems to support the view here urged. Also, *Nathan* v. *Louisiana*, 8 How. 73, 80.

The Board of Trade, in furnishing a building where traders meet to make contracts—only a small portion of which relate to grain which has, before the sale on the exchange is made, come across state lines, or is to go across state lines after it reaches the purchaser on the exchange—seems to have no more connection with interstate commerce than have the owners of the grain-mixing warehouses of Chicago, which store much grain that has come from, or is to go to, other States. *Munn* v. *Illinois*, 94 U. S. 135; *Covington Bridge Co.* v. *Kentucky*, 154 U. S. 213; *Budd* v. *New York*, 143

U. S. 517, 545. See *Paul* v. *Virginia*, 8 Wall. 168; *Hooper* v. *California*, 155 U. S. 648; *New York Life Insurance Co.* v. *Cravens*, 178 U. S. 389; *Merchants Exchange* v. *Missouri*, 248 U. S. 365; *Brodnax* v. *Missouri*, 219 U. S. 285; *House* v. *Mayes*, 219 U. S. 270; *Pittsburg & Southern Coal Co.* v. *Louisiana*, 156 U. S. 590; *Blumenstock Bros. Advertising Agency* v. *Curtis Publishing Co.*, 252 U. S. 436; *Williams* v. *Fears*, 179 U. S. 270; *Cargill Co.* v. *Minnesota*, 180 U. S. 452, 470; *Ficklen* v. *Shelby County Taxing District*, 145 U. S. 1; *United States Fidelity Co.* v. *Kentucky*, 231 U. S. 394.

It is not here claimed that, if elevator or board of trade does some act, which prejudicially touches, or will interfere with interstate commerce—as was claimed of a rule of this Board in *Chicago Board of Trade* v. *United States*, 246 U. S. 231, or if members of an exchange conspire to run a corner " *affecting the entire trade of the country* " in a particular commodity, as in *United States* v. *Patten*, 226 U. S. 525,—Congress may not, as to such encroachments, enact a prohibiting act. All that we do contend is that—considering together this Board of Trade and all its activities—the general regulation thereof as respects admissions to membership, commission rates, what, if any, memoranda of contracts should be made, etc., should be held to be a part of intrastate commerce, and within the exclusive power of the State. *Hammer* v. *Dagenhart*, 247 U. S. 251, 273, 275.

The Constitution expressly limited the taxing power of Congress to certain purposes—which were necessarily expressed in general terms. It conferred on Congress the " power to lay and collect taxes, duties, imposts and excises, to pay [for the purpose of paying] the debts and provide [providing] for the common defense and general welfare of the United States."

The protective tariff was then an established governmental system in England and elsewhere, and doubtless

the Constitution contemplated that in the laying of imposts Congress might fix the duties with a view to excluding importation rather than raising revenue.

But there is no warrant for saying that at that time the power to lay internal taxes had any other legitimate purpose than the raising of revenue; or that the States, in conferring on the National Government a concurrent power to levy taxes, ever contemplated that Congress might exercise that power for any other purpose than to raise revenue.

This, we think, is apparent for this reason: Under its then existing constitution each State had unlimited power to regulate the commercial and other transactions of its citizens. Resort to a roundabout way, of doing this through the levying of taxes was not necessary. This is also true of the governments of Europe. There was nowhere any dual system of government requiring a written constitution to accurately separate and define the powers that belong to each of the separate governments, and hence no occasion or incentive to use the taxing power as a cloak to accomplish something other than getting revenue.

Indeed, does anyone suppose that—considering the pronounced disinclination of the States to surrender their own powers—the Constitution would have been adopted by the requisite number of States, if John Marshall in Virginia and Alexander Hamilton in New York, had responded affirmatively to the question, whether the proper exercise of power to tax thus to be conferred, included also the power to regulate, or to prohibit each State from regulating, its internal trade and other local affairs?

In *McCulloch* v. *Maryland*, 4 Wheat. 316, 431, in deciding that a state statute, providing a tax on a branch of the United States Bank, was an illegal encroachment upon this federal power, this court made use of the expression, " that the power to tax involves the power to

destroy." This was only a way of saying that any state taxing-statute might impair the federal power. It was a mere phrase, used argumentatively and not to support a federal statute, but to annul a state statute. In *Veazie Bank* v. *Fenno,* 8 Wall. 533, the power of Congress to impose a tax on the notes of a state bank was upheld upon the ground that it was the proper exercise of the power to provide a circulation of coin and to authorize the emission of letters of credit, although it was also stated—in answer to the argument that the tax was so excessive as to indicate the purpose of Congress to destroy the bank's franchise—that the court could not pronounce the law unconstitutional for the reason " that the tax was excessive." With this as a basis, this phrase of Chief Justice Marshall—that the power to tax involves the power to destroy—has now become in the minds of many in and out of Congress a fixed legal maxim, by which the powers of Congress are to be measured. Congress now treats it as fully warranting the use of the taxing power to regulate or prohibit whatever it may not otherwise regulate or prohibit.

But Congress has not always thought that the power to tax implied the power to regulate or destroy. In 1892 a bill passed one House of Congress, commonly known as the " Hatch Anti-Option Bill," which—like the present act—excepted from its provisions contracts for future delivery of grain when made by farmers. It imposed a tax of 20 cents a bushel on all other contracts for the future delivery of grain, required every person engaged in the business of making such contracts to take out a license, and required that the terms of all such contracts should be in writing, and be recorded in books. The purpose was, by the size of the tax, to suppress all future trading. But it was defeated in the Senate, largely by the arguments against its constitutionality. One of these was by Senator (afterwards Chief Justice) White, who argued

that the bill was " flagrantly unconstitutional legislation."
39 Cong. Rec. 6513, 6515–6517.

This court was not yet decided that where, as here, the
law does not profess to be solely a taxing measure, but
by its title and its terms is also a law regulating some-
thing which it is beyond the power of Congress to regulate,
the statute must be sustained under the taxing power.
To so hold would be to shut one's eyes to the real purpose
of the law, when Congress had disclosed that motive and
purpose in the terms of the statute.

Distinguishing: *McCray* v. *United States,* 195 U. S.
27; *United States* v. *Dewitt,* 9 Wall. 41; *License Tax
Cases,* 5 Wall. 462; *United States* v. *Doremus,* 249 U. S.
86, 93.

*Mr. Solicitor General Beck,* with whom *Mr. Blackburn
Esterline,* Special Assistant to the Attorney General, *Mr.
R. W. Williams,* and *Mr. Fred. Lees* were on the brief, for
appellees.

" Trading in futures " and the evils attendant there-
upon are subjects with which both legislative and judicial
bodies have long been familiar. If extraneous light for
the proper interpretation of the statute is helpful, the
" history of the times " or " the environment at the time
of the enactment of a particular law—that is, the history
of the period when it was adopted "—may be resorted to.
*Chicago Board of Trade* v. *United States,* 246 U. S. 231,
238.

As to the history and purposes of the act see: Report
of Federal Trade Commission on the Grain Trade, Sep-
tember 15, 1920, vol. I, p. 315; Report, Senate Committee
on Agriculture, 67th Cong., 1st sess., Sen. Rep. No. 212;
Appendix D, statement of Senator Capper, August 9,
1921, 61 Cong. Rec., pp. 5220–5227.

The court has long been familiar with the organization
of the Chicago Board of Trade and its methods of trans-

acting business. *Nicol v. Ames,* 173 U. S. 509; *Clews* v. *Jamieson,* 182 U. S. 461; *Board of Trade* v. *Christie Grain & Stock Co.,* 198 U. S. 236; *Chicago Board of Trade* v. *United States,* 246 U. S. 231. The Supreme Court of Illinois has frequently considered the same subjects. *Pickering* v. *Cease,* 79 Ill. 328; *Lyon* v. *Culbertson,* 83 Ill. 33; *Pearce* v. *Foote,* 113 Ill. 228; *Cothran* v. *Ellis,* 125 Ill. 496; *New York & Chicago Grain & Stock Exchange* v. *Board of Trade,* 127 Ill. 153; *Schneider* v. *Turner,* 130 Ill. 28; *Soby* v. *People,* 134 Ill. 66; *Central Stock Exchange* v. *Board of Trade,* 196 Ill. 396; *Weare Commission Co.* v. *People,* 209 Ill. 528, affirming 111 Ill. App. 116; *Board of Trade* v. *Dickinson,* 114 Ill. App. 295.

The motives of Congress in laying the tax and fixing the amount of it may not be inquired into. *McCray* v. *United States,* 195 U. S. 27, 59; *Hammer* v. *Dagenhart,* 247 U. S. 251, 276; *Treat* v. *White,* 181 U. S. 264, 269; *Fletcher* v. *Peck,* 6 Cr. 87, 130, 131; *Lottery Cases,* 188 U. S. 321. In the last cited case the commerce power was used to discourage gambling in lotteries as the taxing power is now used to discourage gambling in the greatest staple of commerce.

The fact that the tax may be burdensome even to the extent of causing the discontinuance of the particular business affected will not influence the court in reaching its judgment. *Patton* v. *Brady,* 184 U. S. 608, 623; *Spencer* v. *Merchant,* 125 U. S. 345, 355; *Alaska Fish Co.* v. *Smith,* 255 U. S. 44, 48.

The provision for admission to membership in the Board of Trade of a representative of a coöperative association is not a taking of property without due process of law.

The Future Trading Act is essentially a taxing statute. This is not less so even if the court assumed that the tax was prohibitive, but there is nothing before the court which would justify the belief that the tax is prohibitive.

The provisions, other than that which imposes the tax, are merely a method of classification. The power to classify subjects for taxation, in order to determine when the tax is imposed and when it is not, is certainly as great or greater than the like power of classification in the exercise of any other constitutional power. This being so, the propriety of the classification in this instance is justified in the case of *Lewis Publishing Co.* v. *Morgan,* 229 U. S. 288. See *McCray* v. *United States,* 195 U. S. 27, 61, 62; *American Sugar Refining Co.* v. *Louisiana,* 179 U. S. 89, 92; *Flint* v. *Stone Tracy Co.,* 220 U. S. 107, 158; *German Alliance Insurance Co.* v. *Kansas,* 233 U. S. 389, 418; *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342, 357; *Tanner* v. *Little,* 240 U. S. 369, 382; *Alaska Fish Co.* v. *Smith,* 255 U. S. 44, 48, 49.

Precedents for the classification made by the Future Trading Act are found in other statutes, the constitutionality of which has been upheld by this court. The oleomargarine tax; the tax on sugar refineries, excepting farmers and planters grinding and refining their own molasses; the tax on state bank notes, inapplicable to national bank notes; the tax on phosphorus matches but not on other matches; the tax on sales of boards of trade but not sales made elsewhere.

The tax is not a direct tax upon the property but a tax on the privilege of selling the property for future delivery. *Nicol* v. *Ames,* 173 U. S. 509, 519, 520; *Thomas* v. *United States,* 192 U. S. 363, 371.

The tax is uniform throughout the United States and therefore within the constitutional requirement.

For a hundred years the use of the taxing power has not been limited to the raising of revenue alone, but, through the protective tariff, has been employed to encourage industries in this country. In the application of the tariff, Congress has looked to the " general welfare " of the country, as is done in the case of the Future Trading

Act, and not merely to the raising of revenue. In laying a tax, Congress necessarily uses discretion, imposing the burden upon those objects which are least useful or valuable to the public, or perhaps even hurtful to its interests, thereby aiding and encouraging those objects which are of greater use or value to the public. The use of the taxing power to promote the moral welfare of the nation—as the heavy duties on liquors or tobacco—is as old as the taxing power. The tax imposed by the Future Trading Act puts the burden upon the least necessary and perhaps the harmful transactions affecting the grain market of the country, and at the same time provides for the making of the transactions necessary to the growers and users of grain.

Even though the tax may be heavy enough to cause discontinuance of the present manner of conducting the business, still a reasonable method of preserving the business, and one which Congress believes is for the public welfare, is provided. The price of cash grain is influenced by quotations on the future markets. If, for reasons peculiar to exchange methods and transactions, the price of futures is depressed unduly, as frequently happens, by conditions not in anywise connected with the total available supply of grain or the demand therefor, an indefensible economic and commercial condition arises, harmful to all persons owning or dealing in cash grain, including not only the farmer, but the grain merchant as well. That the taxing power may be used in this way is well settled. *Bell's Gap R. R. Co.* v. *Pennsylvania,* 134 U. S. 232, 237; *Alaska Fish Co.* v. *Smith,* 255 U. S. 44, 49.

Precedents are to be found in the Cotton Futures Act, August 11, 1916, 39 Stat. 446, 476; the Warehouse Act, August 11, 1916, 39 Stat. 486; the Cotton Futures Act (as originally enacted,) August 18, 1914, 38 Stat. 693, upheld in *Hubbard* v. *Lowe,* 226 Fed. 135, 137.

The supertax is not a new device in the history of our legislation. It was as long ago as 1866 applied to the

circulation of state bank notes (14 Stat. 146); in 1886, to the sale of artificially colored oleomargarine (24 Stat. 209; 32 Stat. 193), and in 1912, to the manufacture of phosphorus matches (37 Stat. 81). The first of these two statutes was sustained in *Veazie Bank* v. *Fenno,* 8 Wall. 533, and the second in *McCray* v. *United States,* 195 U. S. 27.

The taxing power of Congress is not limited to the purpose of raising revenue. Story, Const., §§ 965, 973.

Congress could lay a tax on the privilege of doing a warehouse business and except warehouses operated under federal license, as it did by the Warehouse Act of August 11, 1916. The Future Trading Act does no more than this except that the two provisions—the laying of the tax and the means of avoiding it—are combined in one act. The State is still left free to legislate as it pleases with reference to future trading. Designation as a contract market would not authorize the Board of Trade or its members to violate any state law; on the contrary, they would have to comply with it. See *United States* v. *Doremus,* 249 U. S. 86, 92.

The Future Trading Act may readily be sustained as an act to regulate commerce. *Board of Trade* v. *Christie Grain & Stock Co.,* 198 U. S. 236, 247; *Otis* v. *Parker,* 187 U. S. 606, 609; *Chicago Board of Trade* v. *United States,* 246 U. S. 231.

An exchange which deals in the purchase and sale of more grain than the whole world either produces or consumes must have a very real relation to interstate and foreign commerce. *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282.

Mr. Chief Justice Taft, after making the foregoing statement of the case, delivered the opinion of the court.

The first question for our consideration is whether, assuming the act to be invalid, the complainants on the

face of their bill state sufficient equitable grounds to justify granting the relief they ask. We think it clear that within the cases of *Smith* v. *Kansas City Title & Trust Co.,* 255 U. S. 180; *Brushaber* v. *Union Pacific R. R. Co.,* 240 U. S. 1, 10; *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429, and *Dodge* v. *Woolsey,* 18 How. 331, 341, 346, the averments of the bill entitle them to relief against the Board of Trade of Chicago, its president and its directors. The bill shows that the act, if enforced, will seriously injure the value of the Board of Trade to its members, and the pecuniary value of their memberships. If the law be unconstitutional, then it was the duty of the Board of Directors to bring an action to resist its enforcement. It is quite like the case of *Dodge* v. *Woolsey,* in which the court said with respect to a similar refusal (p. 345):

"Now, in our view, the refusal upon the part of the directors, by their own showing, partakes more of disregard of duty, than of an error of judgment. It was a non-performance of a confessed official obligation, amounting to what the law considers a breach of trust, though it may not involve intentional moral delinquency. It was a mistake, it is true, of what their duty required from them, according to their own sense of it, but, being a duty by their own confession, their refusal was an act outside of the obligation which the charter imposed upon them to protect what they conscientiously believed to be the franchises of the bank. A sense of duty and conduct contrary to it, is not 'an error of judgment merely,' and cannot be so called in any case."

The averments of the bill are that the Board of Directors refused the request to bring the suit because they feared to antagonize the public officials whose duty it was to construe and enforce the act, and not because they thought the act was constitutional. They must be taken to have admitted this by the motion to dismiss.

In *Wathen* v. *Jackson Oil & Refining Co.*, 235 U. S. 635, and in *Corbus* v. *Alaska Treadwell Gold Mining Co.*, 187 U. S. 455, thought to cast doubt upon the sufficiency of the averments made herein to sustain complainants' right to file the bill, there had been no request made of the corporation or the Board of Directors to bring suit and no refusal, both of which are present in the case at bar.

A further question arises as to whether this is a suit for an injunction against the collection of the tax in violation of § 3224, Rev. Stats., in so far as it seeks relief against the District Attorney and Collector of Internal Revenue. Were this a state act, injunction would certainly issue against such officers under the decisions in *Ex parte Young*, 209 U. S. 123; *Ohio Tax Cases*, 232 U. S. 576, 587; *McFarland* v. *American Sugar Refining Co.*, 241 U. S. 79, 82. Does § 3224, Rev. Stats., prevent the application of similar principles to a federal taxing act? It has been held by this court, in *Dodge* v. *Brady*, 240 U. S. 122, 126, that § 3224 of the Revised Statutes does not prevent an injunction in a case apparently within its terms in which some extraordinary and entirely exceptional circumstances make its provisions inapplicable. See also *Dodge* v. *Osborn*, 240 U. S. 118, 122. In the case before us, a sale of grain for future delivery without paying the tax will subject one to heavy criminal penalties. To pay the heavy tax on each of many daily transactions which occur in the ordinary business of a member of the exchange, and then sue to recover it back would necessitate a multiplicity of suits and, indeed, would be impracticable. For the Board of Trade to refuse to apply for designation as a contract market in order to test the validity of the act would stop its 1600 members in a branch of their business most important to themselves and to the country. We think these exceptional and extraordinary circumstances with respect to the operation of this act make § 3224 inapplicable. The right to sue for an injunction against the

taxing officials is not, however, necessary to give us juris-
diction. If they were to be dismissed under § 3224, the
bill would still raise the question here mooted against the
Board of Trade and its directors. The Solicitor General
has appeared on behalf of the Government and argued the
case in full on all the issues. Our conclusion as to the
validity of the act will, therefore, have the same effect as
did the judgment of the court in respect to the income
tax law in *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S.
429, to which the Government was not a party but in
which the Attorney General on its behalf was heard as
*amicus curiae.*

The act whose constitutionality is attacked is entitled
"An Act Taxing contracts for the sale of grain for future
delivery, and options for such contracts, and *providing
for the regulation of boards of trade,* and for other pur-
poses." (Italics ours.)

Section 4 imposes a tax, in addition to any imposed by
law, of 20 cents a bushel involved in every contract of sale
of grain for future delivery, with two exceptions. The
first exception is where the seller holds and owns the grain
at the time of sale, or is the owner or renter of land on
which the grain is to be grown, or is an association made of
such owners or renters. The second exception is where
such contracts are made by or through a member of the
Board of Trade designated by the Secretary of Agricul-
ture as a contract market, and are evidenced by a memo-
randum containing certain particulars to be kept for a
period of three years or as much longer as the Secretary of
Agriculture shall direct and to be open to official in-
spection. This tax on sale contracts for future delivery
is in addition to a tax now imposed by the Revenue Act
of February 24, 1919, c. 18, 40 Stat. 1057, 1136, Title XI,
Schedule A, of 2 cents on every hundred dollars in value
of such sales.

Section 5 authorizes the Secretary of Agriculture to
designate boards of trade as contract markets when and

only when such boards comply with certain conditions
and requirements, as follows:

*a.* When located at a terminal market where cash grain
is sold in sufficient amount and under such conditions as
to reflect the value of the grain in its different grades, and
where there is recognized official weighing and inspection
service;

*b.* When the governing body of the Board adopts rules
and enforces them, requiring its members to make and
keep the memorandum of all transactions in grain
whether cash or for future delivery as directed by the
Secretary;

*c.* When the governing body prevents the dissemina-
tion by the Board or any member thereof of false, mis-
leading, or inaccurate reports, concerning crop or market
information or conditions that affect or tend to affect the
price of commodities.

*d.* When the governing board provides for the preven-
tion of manipulation of prices, or the cornering of any
grain, by the dealers or operators upon such board.

*e.* When the governing body admits to membership on
the Board and all its privileges any authorized representa-
tive of any lawfully formed and conducted coöperative
associations of producers having adequate financial respon-
sibility; "*Provided,* That no rule of a contract market
against rebating commissions shall apply to the distribu-
tion of earnings among bona fide members of any such co-
operative association."

*f.* When the governing body of the Board shall make
effective the orders and decisions of the commission ap-
pointed under § 6.

Section 6 provides that any board of trade desiring to
be designated as a contract market shall apply to the
Secretary of Agriculture, with a showing that it complies
with the conditions already stipulated in § 5, and a suf-
ficient assurance of future compliance. The section ap-

points a commission of the Secretary of Agriculture, the Secretary of Commerce, and the Attorney General, who may, after due notice to the officers of the Board, suspend for six months or revoke the designation of any board as a contract market, upon a showing of failure to comply with the requirements of § 5.

Provisions are made for an appeal from this order to the Circuit Court of Appeals, and appeal is granted to the commission from the refusal of the Secretary of Agriculture, upon application, to designate any board as a contract market.

Section 6 also provides that if the Secretary of Agriculture has reason to believe that any person is violating any provisions of the act or is attempting to manipulate the market price of grain in violation of the provisions of § 5, or any of the rules or regulations made pursuant to its requirements, he may have served upon such persons a complaint for a hearing before a referee, to take evidence, to be transmitted to the Secretary as chairman of the commission, and the commission may, after a finding of guilt, issue an order requiring all contract markets to refuse such person trade or privileges. This order may be revised in the Circuit Court of Appeals.

Section 7 provides that the tax imposed shall be paid by the seller and shall be collected either by affixing stamps or by such other method as may be prescribed by the published regulations of the Secretary of the Treasury.

Section 10 provides a penalty for any person who shall fail to evidence the contract of sale he makes by memorandum or to keep the record of it, or to pay the tax as provided in §§ 4 and 5, with a penalty of 50 per cent. of the tax and a punishment as a misdemeanor and a fine of $10,000, with imprisonment for one year or both and the costs of the prosecution.

It is impossible to escape the conviction, from a full
reading of this law, that it was enacted for the purpose of
regulating the conduct of business of boards of trade
through supervision of the Secretary of Agriculture and
the use of an administrative tribunal consisting of that
Secretary, the Secretary of Commerce, and the Attorney
General.   Indeed the title of the act recites that one of
its purposes is the regulation of boards of trade.   As the
bill shows, the imposition of 20 cents a bushel on the
various grains affected by the tax is most burdensome.
The tax upon contracts for sales for future delivery under
the Revenue Act is only 2 cents upon $100 of value,
whereas this tax varies according to the price and charac-
ter of the grain from 15 per cent. of its value to 50 per
cent.   The manifest purpose of the tax is to compel
boards of trade to comply with regulations, many of
which can have no relevancy to the collection of the tax
at all.   Even if we conceded, as we do not, that the keep-
ing of a memorandum and of the particulars of each sale
as a record for three years or more, not only of contracts
for future delivery, but also of cash sales, neither of which
are subject to tax in designated boards of trade, would
help taxing officers in any way to detect the evasions of
this tax outside of such boards, no such construction can
be put upon the provisions which require the board of
trade to prevent a dissemination of false or misleading
reports or to prevent the manipulation of prices or the
cornering of grain or which enforce the admission to
membership in the Board of the representatives of co-
operative associations of producers or the abrogation of
rules against rebate as applied to such representatives.
The act is in essence and on its face a complete regulation
of boards of trade, with a penalty of 20 cents a bushel on
all " futures " to coerce boards of trade and their members
into compliance. · When this purpose is declared in the
title to the bill, and is so clear from the effect of the pro-

visions of the bill itself, it leaves no ground upon which the provisions we have been considering can be sustained as a valid exercise of the taxing power. The elaborate machinery for hearings by the Secretary of Agriculture and by the commission of violations of these regulations, with the withdrawal by the commission of the designa- tion of the Board as a contract market, and of complaints against persons who violate the act or such regulations, and the imposition upon them of the penalty of requir- ing all boards of trade to refuse to permit them the usual privileges, only confirm this view.

Our decision, just announced, in the *Child Labor Tax Case, ante,* 20, involving the constitutional validity of the Child Labor Tax Law, completely covers this case. We there distinguish between cases like *Veazie Bank* v. *Fenno,* 8 Wall. 533, and *McCray* v. *United States,* 195 U. S. 27, in which it was held that this court could not limit the discretion of Congress in the exercise of its con- stitutional powers to levy excise taxes because the court might deem the incidence of the tax oppressive or even destructive. It was pointed out that in none of those cases did the law objected to show on its face, as did the Child Labor Tax Law, detailed regulation of a concern or business wholly within the police power of the State, with a heavy exaction to promote the efficacy of such regulation. We there say (pp. 37, 38):

" Out of a proper respect for the acts of a coördinate branch of the Government, this court has gone far to sus- tain taxing acts as such, even though there has been ground for suspecting from the weight of the tax it was intended to destroy its subject. But, in the act before us, the presumption of validity cannot prevail, because the proof of the contrary is found on the very face of its pro- visions. Grant the validity of this law, and all that Con- gress would need to do, hereafter, in seeking to take over to its control any one of the great number of subjects of

public interest, jurisdiction of which the States have never
parted with, and which are reserved to them by the Tenth
Amendment, would be to enact a detailed measure of com-
plete regulation of the subject and enforce it by a so-
called tax upon departures from it.  To give such magic
to the word ' tax ' would be to break down all constitu-
tional limitation of the powers of Congress and completely
wipe out the sovereignty of the States."

This has complete application to the act before us, and
requires us to hold that the provisions of the act we have
been discussing can not be sustained as an exercise of the
taxing power of Congress conferred by § 8, Article I.

We come to the question then, Can these regulations
of boards of trade by Congress be sustained under the
commerce clause of the Constitution?  Such regulations
are held to be within the police powers of the State.
*House* v. *Mayes,* 219 U. S. 270; *Brodnax* v. *Missouri,* 219
U. S. 285.  There is not a word in the act from which it
can be gathered that it is confined in its operation to inter-
state commerce.  The words " interstate commerce " are
not to be found in any part of the act from the title to
the closing section.  The transactions upon which the tax
is to be imposed, the bill avers, are sales made between
members of the Board of Trade in the City of Chicago for
future delivery of grain, which will be settled by the proc-
ess of offsetting purchases or by a delivery of warehouse
receipts of grain stored in Chicago.  Looked at in this
aspect and without any limitation of the application of
the tax to interstate commerce, or to that which the
Congress may deem from evidence before it to be an ob-
struction to interstate commerce, we do not find it possible
to sustain the validity of the regulations as they are set
forth in this act.  A reading of the act makes it quite clear
that Congress sought to use the taxing power to give
validity to the act.  It did not have the exercise of its
power under the commerce clause in mind and so did not

introduce into the act the limitations which certainly would accompany and mark an exercise of the power under the latter clause.

In *Ware & Leland* v. *Mobile County*, 209 U. S. 405, it was held that contracts for the sale of cotton for future delivery which do not oblige interstate shipments are not subjects of interstate commerce, and that a state tax on persons engaged in buying and selling cotton for future delivery was not a regulation of interstate commerce or beyond the power of the State.

It follows that sales for future delivery on the Board of Trade are not in and of themselves interstate commerce. They can not come within the regulatory power of Congress as such, unless they are regarded by Congress, from the evidence before it, as directly interfering with interstate commerce so as to be an obstruction or a burden thereon. *United States* v. *Ferger,* 250 U. S. 199. It was upon this principle that in *Stafford* v. *Wallace,* 258 U. S. 495, we held it to be within the power of Congress to regulate business in the stockyards of the country, and include therein the regulation of commission men and of traders there, although they had to do only with sales completed and ended within the yards, because Congress had concluded that through exorbitant charges, dishonest practices and collusion they were likely, unless regulated, to impose a direct burden on the interstate commerce passing through.

So, too, in *United States* v. *Patten,* 226 U. S. 525, it was held that though this court, as we have seen, had decided in the *Ware & Leland Case* that mere contracts for sales of cotton for future delivery which did not oblige interstate shipments were not interstate commerce, an indictment charging the defendants with having cornered the whole cotton market of the United States by excessive purchases of cotton for future delivery and thus conspired to restrain, obstruct and monopolize interstate

commerce in cotton, was sustained under the first and second sections of the Sherman Anti-Trust Law. This case, like *Stafford* v. *Wallace,* followed the principles of *Swift & Co.* v. *United States,* 196 U. S. 375. But the form and limitations of the act before us form no such basis as those cases presented for federal jurisdiction and the exercise of the power to protect interstate commerce. Our conclusion makes it necessary for us to hold § 4 and those parts of the act which are regulations affected by the so-called tax imposed by § 4, to be unenforceable.

Section 11 of this act directs that " if any provision of this Act or the application thereof to any person or circumstances is held invalid, the validity of the remainder of the Act and of the application of such provision to other persons and circumstances shall not be affected thereby."

Section 4 with its penalty to secure compliance with the regulations of Boards of Trade is so interwoven with those regulations that they can not be separated. None of them can stand. Section 11 did not intend the court to dissect an unconstitutional measure and reframe a valid one out of it by inserting limitations it does not contain. This is legislative work beyond the power and function of the court. In *United States* v. *Reese,* 92 U. S. 214, presenting a similar question as to a criminal statute, Chief Justice Waite said (p. 221):

" We are not able to reject a part which is unconstitutional, and retain the remainder, because it is not possible to separate that which is unconstitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not now there. Each of the sections must stand as a whole, or fall together. The language is plain. There is no room for construction, unless it be as to the effect of the Constitution. The question, then, to be deter-

mined, is, whether we can introduce words of limitation into a penal statute so as to make it specific, when, as expressed, it is general only. . . . To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of our duty."

*Trade-Mark Cases,* 100 U. S. 82; *Butts v. Merchants & Miners Transportation Co.,* 230 U. S. 126.

To be sure in the cases cited there. was no saving provision like § 11, and undoubtedly such a provision furnishes assurance to courts that they may properly sustain separate sections or provisions of a partly invalid act with out hesitation or doubt as to whether they would have been adopted, even if the legislature had been advised of the invalidity of part. But it does not give the court power to amend the act.

There are sections of the act to which under § 11 the reasons for our conclusion as to § 4 and the interwoven regulations do not apply. Such is § 9 authorizing investigations by the Secretary of Agriculture and his publication of results. Section 3, too, would not seem to be affected by our conclusion. It provides:

" That in addition to the taxes now imposed by law there is hereby levied a tax amounting to 20 cents per bushel on each bushel involved therein, whether the actual commodity is intended to be delivered or only nominally referred to, upon each and every privilege or option for a contract either of purchase or sale of grain, intending hereby to tax only the transactions known to the trade as ' privileges,' ' bids,' ' offers,' ' puts and calls,' ' indemnities,' or ' ups and downs.' "

This is the imposition of an excise tax upon certain transactions of a unilateral character in grain markets which approximate gambling or offer full opportunity for it and does not seem to be associated with § 4. Such a tax without more would seem to be within the congres-

sional power. *Treat* v. *White,* 181 U. S. 264; *Nicol* v. *Ames,* 173 U. S. 509; *Thomas* v. *United States,* 192 U. S. 363. But these are questions which are not before us and upon which we wish to express no definite opinion.

The injunction against the Board of Trade and its officers, and the injunction against the Collector of Internal Revenue and the District Attorney, should be granted, so far as § 4 is concerned and the regulations of the act interwoven within it. The court below acquired no personal jurisdiction of the Secretary of Agriculture and the Commissioner of Internal Revenue by proper service and the dismissal as to them was right.

*The decree of the District Court is reversed, and the cause is remanded for further proceedings in conformity to this opinion.*

MR. JUSTICE BRANDEIS, concurring.

I agree that the Future Trading Act is unconstitutional; but I doubt whether the plaintiffs are in a position to require the court to pass upon the constitutional question in this case. It seems proper to state the reasons for my doubt.

In essence this is a suit by eight members of the Chicago Board of Trade to prevent its directors and officers from accepting the offer of the Government to designate it a " contract market." The act does not require the corporation to become a " contract market." If—and only if—it elects to become such, must its rules, and the conduct of its business, conform to requirements prescribed by the act or the Secretary of Agriculture. In that event its members may likewise be subjected individually to some slight additional trouble and expense; for the Secretary of Agriculture may require a more detailed record of transactions than is ordinarily kept and may require that the records be preserved three years. Members may, in that event, also suffer individually some loss of business

through the competition of representatives of producers coöperative organizations who are to be admitted to the privileges of the exchange if it becomes a " contract market." On the other hand, by acceptance of the designation as a " contract market " members of the Board of Trade would be relieved from all danger of liability for taxes on their future trading; and if the act is enforced generally, the profits of the individual members may increase largely; because the general public, being debarred by the act from gambling on futures in bucket shops, will naturally turn to the few " contract markets " when desiring to speculate in futures.

To decide whether the corporation and its members will be benefited or injured by its becoming a " contract market " is a matter calling for the exercise of business judgment. The charter vests in the directors and managers broad powers; and, so far as appears, there is nothing in the by-laws or in the nature of the action proposed which prevents their exercising freely their judgment in this, as in other matters affecting the business. No radical or fundamental change in the object, character or methods of the business of the corporation or of its members is involved. There is no allegation that the directors and managing officers are incapacitated from acting because their interests are adverse to the corporation or its members; or that their action should be interfered with because they are purposing to exercise their powers fraudulently or otherwise in violation of their trust. Nor is it alleged that efforts have been made to control their action by calling a meeting of the 1600 members or that such efforts would be vain, or that there is an emergency requiring interposition of a court of equity. The requirements of Equity Rule 27 are not complied with by alleging simply that plaintiffs requested the Board of Directors " to institute a suit to have said Future Trading Act adjudged unconstitutional " and that the plaintiffs " are informed and

believe that said Board of Directors refused said request because they fear to antagonize the public officials whose duty it is to construe and enforce said Act."

That under such circumstances a stockholder's bill is fatally defective, although it was brought to restrain the enforcement of a statute alleged to be unconstitutional, is well settled; and the rule has been recently applied. *Wathen* v. *Jackson Oil & Refining Co.*, 235 U. S. 635; *Corbus* v. *Alaska Treadwell Gold Mining Co.*, 187 U. S. 455. In the case at bar, plaintiffs' case is still weaker than it was in those cited. For aught that appears most of the members of the exchange, as well as its directors and managing officers, may be of opinion that they will be benefited by the enforcement of the act. Nothing is better settled than that an individual may acquiesce in or waive an admitted infringement of a constitutional right; and I am not aware of any rule of law which requires a corporation, upon request of a minority stockholder, to play the knight-errant and tilt at every statute affecting it, which he believes to be invalid. A corporation, like an individual, may refrain from embarking in litigation to enforce even a clear right of action if litigation is deemed inadvisable; and it is immaterial, in this respect, whether the right of action arises at common law or under a statute or under a constitutional provision. Nor do I know of any reason why the disadvantages which may flow from " antagonizing public officials " may not properly be considered by directors and managing officers of a corporation in determining whether to embark in litigation. The fear of antagonizing customers or other business connections or the public is a motive which quite commonly and properly influences the conduct of men.

If, after the corporation has become a " contract market " its directors and managing officers should seek to subject the plaintiffs, as members, to unauthorized restrictions or should attempt to deprive them of vested rights,

relief may, of course, be had in a proper proceeding. And likewise if the plaintiffs now have, as individuals, rights entitled to protection, there are appropriate remedies. But this is not such a suit. Here members of a corporation seek to enforce alleged derivative rights; and I doubt whether they have shown that they are in a position to do so.