LARABEE FLOUR MILLS CO. v. NEE, and
twenty-three other cases. *

Nos. 2725, 2730, 2733, 2734, 2738, 2739, 2741–
2752, 2754, 2755, 2762, 2765, 2766, 2771.

District Court, W. D. Missouri, W. D.

Oct. 3, 1935.

*Cause remanded — F.(2d) —.

See, also (D. C.) 11 F. Supp. 132.

McCune, Caldwell & Downing, of Kansas City, Mo., for plaintiff in No. 2725.

A. Z. Patterson and D. C. Chastain, both of Kansas City, Mo., for plaintiff in No. 2730.

Cecil H. Haas, of Kansas City, Mo., for plaintiffs in Nos. 2733 and 2734.

Philip L. Levi, of Kansas City, Mo., for plaintiff in No. 2738.

E. S. McAnany, of Kansas City, Kan., for plaintiff in No. 2739.

Mann, Mann & Miller, of Springfield, Mo., for plaintiff in No. 2741.

McReynolds & Flanigan, of Carthage, Mo., for plaintiffs in Nos. 2742, 2746, 2748, and 2749.

Glen A. Wisdom, of Kansas City, Mo., for plaintiffs in Nos. 2743–2745 and 2762.

Hunt C. Moore, A. F. Smith, and George T. Aughinbaugh, all of Kansas City, Mo., for plaintiff in No. 2747.

Mercer Arnold, of Joplin, Mo., for plaintiff in No. 2750.

David S. Alper and Max A. Patten, Jr., both of Joplin, Mo., for plaintiff in No. 2751.

Burrus & Burrus, of Independence, Mo., for plaintiff in No. 2752.

Elias Berell and W. I. Farmer, both of Kansas City, Mo., for plaintiff in No. 2754.

Charles M. Grayston, of Joplin, Mo., for plaintiff in No. 2755.

Conrad & Durham, of Kansas City, Mo., for plaintiff in No. 2765.

Matthew H. Galt and Wm. D. Tatlow, both of Springfield, Mo., for plaintiff in No. 2766.

Charles M. Grayston, of Joplin, Mo., for plaintiff in No. 2771.

Maurice M. Milligan, U. S. Atty., and Thomas A. Costolow, Asst. U. S. Atty., both of Kansas City, Mo., for defendant in all cases.

OTIS, District Judge.

Plaintiff's bill in each of these cases alleges that the plaintiff is subject to the processing tax provided for in the Agricultural Adjustment Act (48 Stat. 31, as amended, title 7, U. S. C. § 601 et seq.); that demand has been made by the defendant that it pay the tax; that the provision for the tax in the act is invalid because beyond the constitutional authority of the Congress. The bill prays that the defendant be enjoined from collecting the tax from the plaintiff. It prays also a declaratory judgment that the processing tax provision in the act is unconstitutional.

Hitherto a temporary injunction has been granted in each of these cases. See opinion in Washburn Crosby Co. v. Nee et al. (D. C.) 11 F. Supp. 822.

At the time of the granting of the temporary injunctions in the cases earliest filed, July 31, 1935, it was announced by the court that all the cases then filed and such as might thereafter be filed would be tried on the merits September 10, 1935. Pending motions of the defendant to dismiss, the bills were overruled without prejudice to the renewal of such motions in answers directed to be filed. Answers have been filed in all of the cases.

Shortly before September 10, 1935, the defendant moved for a continuance in each of the cases. It was alleged in the applications for continuance that cases involving similar questions now are pending in the Supreme Court of the United States and that it was desirable that the cases here should be held until the Supreme Court had declared the applicable law. It was set up also in the applications that the defendant could not adequately prepare for trial by September 10. The applications were overruled, but it was announced by the court that on September 10 only the issues of law made by the bills and the motions to dismiss renewed in the answers would be considered, and that in the event the motions to dismiss were overruled, the matter of hearing testimony on such issues of fact as were made by the pleadings would be set down for a later date, possibly for a date subsequent to the decisions of the Supreme Court in similar cases. Accordingly, on September 10 the motions to dismiss were argued and are now for decision. Motions of the defendant to dissolve the temporary injunctions already issued in the cases also were submitted and now are to be ruled.

### Questions Stated.

The two prime questions for consideration are these: First, entirely apart from the constitutional questions raised by the bills, do the bills state facts entitling the

plaintiffs to the relief in equity they pray? Second, if otherwise the bills do state facts entitling the plaintiffs to relief in equity, is the processing tax provision in the Agricultural Adjustment Act, as amended, constitutional? A third question which was presented when the bills were filed no longer is presented. While the bills pray declaratory judgments that the processing tax provision in the act is unconstitutional, it was conceded by counsel for plaintiffs at the hearing that the August 24, 1935, amendment to the act [7 USCA § 602 et seq.] ended any jurisdiction the court otherwise might have had to make such a declaratory judgment as that asked.

### Right to Equitable Relief.

1. The chief reliance of the defendant in support of his motions to dismiss is section 3224 of the Revised Statutes (26 USCA § 1543), which reads: "No suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court."

If the validity of section 3224 be assumed, and its validity is not challenged in the bills, and if it be given a literal interpretation, it does, of course, preclude the maintenance of any of the suits instituted by the bills here. Each of the suits is "for the purpose of restraining the * * * collection of (a) tax." But the Supreme Court repeatedly has said that section 3224 is not to be interpreted literally.

Section 3224 originally was enacted March 2, 1867 (14 Stat. 475), as an amendment to section 19 of the Act of July 13, 1866 (14 Stat. 98, 152). Before amendment, section 19 of the Act of July 13, 1866, provided: "That no suit shall be maintained in any court for the recovery of any tax alleged to have been erroneously or illegally assessed or collected, until appeal shall have been duly made to the commissioner of internal revenue according to the provisions of law in that regard, and the regulations of the Secretary of the Treasury established in pursuance thereof, and a decision of said commissioner shall be had thereon, unless such suit shall be brought within six months from the time of said decision, or within six months from the time this act takes effect: Provided, That if said decision shall be delayed more than six months from the date of such appeal, then said suit may be brought at any time within twelve months from the date of such appeal."

The amendment of March 2, 1867, added to section 19 the words: "And no suit for the purpose of restraining the assessment or collection of tax shall be maintained in any court."

When the Revised Statutes were compiled, the revisers made slight changes in the verbiage of the amendment and set it up as a section by itself (section 3224 [26 USCA § 1543]). It is still to be construed, however, in pari materia with section 19 of the Act of 1866. Snyder v. Marks, 109 U. S. 189, 192, 3 S. Ct. 157, 27 L. Ed. 901. Since section 19 in its original form recognized the existence of an adequate remedy at law for the recovery of a tax illegally exacted, the prohibition of the amendment (now section 3224) assumed the existence of such an adequate remedy at law. The section is declaratory only of the limitation upon equity jurisdiction which long before had been recognized and enforced by the courts.

Interpreting section 3224, the Supreme Court said, in Miller v. Nut Margarine Co., 284 U. S. 498, 509, 52 S. Ct. 260, 263, 76 L. Ed. 422: "Independently of, and in cases arising prior to, the enactment of the provision (Act of March 2, 1867, 14 Stat. 475) which became Rev. St. § 3224 [26 USCA § 1543], this court, in harmony with the rule generally followed in courts of equity, held that a suit will not lie to restrain the collection of a tax upon the sole ground of its illegality. The principal reason is that, as courts are without authority to apportion or equalize taxes or to make assessments, such suits would enable those liable for taxes in some amount to delay payment or possibly to escape their lawful burden, and so to interfere with and thwart the collection of revenues for the support of the government. And this court likewise recognizes the rule that, in cases where complainant shows that in addition to the illegality of an exaction in the guise of a tax there exist special and extraordinary circumstances sufficient to bring the case within some acknowledged head of equity jurisprudence, a suit may be maintained to enjoin the collector. Dows v. Chicago, 11 Wall. 108, 20 L. Ed. 65; Hannewinkle v. Georgetown, 15 Wall. 547, 21 L. Ed. 231; State Railroad Tax Cases, 92 U. S. 575, 614, 23 L. Ed. 663. Section 3224 is declaratory of the principle first mentioned and is

to be construed as near as may be in harmony with it and the reasons upon which it rests. Cumberland Telephone & Telegraph Co. v. Kelly (C. C. A.) 160 F. 316, 321, 15 Ann. Cas. 1210; Baker v. Baker, 13 Cal. 87, 95; Bradley v. People, 8 Colo. 599, 604, 9 P. 783; 2 Sutherland (2d Lewis Ed.) § 454. The section does not refer specifically to the rule applicable to cases involving exceptional circumstances. The general words employed are not sufficient, and it would require specific language undoubtedly disclosing that purpose, to warrant the inference that Congress intended to abrogate that salutary and well-established rule. This court has given effect to section 3224 in a number of cases. Snyder v. Marks, 109 U. S. 189, 191, 3 S. Ct. 157, 27 L. Ed. 901; Dodge v. Osborn, 240 U. S. 118, 121, 36 S. Ct. 275, 60 L. Ed. 557; Dodge v. Brady, 240 U. S. 122, 36 S. Ct. 277, 60 L. Ed. 560. It has never held the rule to be absolute, but has repeatedly indicated that extraordinary and exceptional circumstances render its provisions inapplicable. Hill v. Wallace, 259 U. S. 44, 62, 42 S. Ct. 453, 66 L. Ed. 822; Dodge v. Osborn, supra, page 121 of 240 U. S., 36 S. Ct. 275 [60 L. Ed. 557]; Dodge v. Brady, supra; Graham v. Du Pont, 262 U. S. 234, 257, 43 S. Ct. 567, 67 L. Ed. 965; Brushaber v. Union Pacific R. Co., 240 U. S. 1, 36 S. Ct. 236, 60 L. Ed. 493, L. R. A. 1917D, 414, Ann. Cas. 1917B, 713."

### "Special and Extraordinary Circumstances."

While the reliance of the defendant is upon section 3224, that of the plaintiffs is upon the exception to the prohibition of the statute read into it by the Supreme Court in the Nut Margarine and other cases. The plaintiffs assert that the cases presented by their bills involve "special and extraordinary circumstances" removing them from the scope of the prohibition. It becomes necessary then to inquire as to what "special and extraordinary circumstances" do remove a suit to enjoin the collection of a tax from the prohibition of section 3224.

The "special and extraordinary circumstances" must be such, said the Supreme Court in the Nut Margarine Case, as are "sufficient to bring the case within some acknowledged head of equity jurisprudence." The Nut Margarine Case itself was ruled to be of that character, in that under its facts it appeared the taxpayer would suffer loss from the enforcement of the tax involved "for which it would have no remedy at law."

Given a right, the absence of an adequate legal remedy always has been regarded not only as one of the acknowledged heads of equity jurisprudence, but as the first and most important of the several heads of such jurisprudence. Thus, the Supreme Court said in Watson v. Sutherland, 5 Wall. 74, 79, 18 L. Ed. 580, "the absence of a plain and adequate remedy at law affords the only test of equity jurisdiction."

Thus again it was said in Dows v. City of Chicago, 11 Wall. 108, 110, 20 L. Ed. 65 (cited by the Supreme Court in the Nut Margarine Case): "No court of equity will, therefore, allow its injunction to issue to restrain their action [the action of tax collectors], except where it may be necessary to protect the rights of the citizen whose property is taxed, and he has no adequate remedy by the ordinary processes of the law. It must appear that the enforcement of the tax would lead to a multiplicity of suits, or produce irreparable injury, or where the property is real estate, throw a cloud upon the title of the complainant, before the aid of a court of equity can be invoked."

In view of these decisions of the Supreme Court (see, also, Hill v. Wallace, 259 U. S. 44, 62, 42 S. Ct. 453, 66 L. Ed. 822), it must be said that section 3224 [26 USCA § 1543] does not prohibit a suit in equity to restrain the collection of a tax where the tax is illegally exacted and where the taxpayer has no adequate remedy at law for its recovery if it is paid by him. Moreover, the remedy at law must not only be adequate; it must be clear and unquestioned. Hopkins v. Southern California Telegraph Co., 275 U. S. 393, 399, 400, 48 S. Ct. 180, 72 L. Ed. 329.

Assuming that the taxes sought to be collected from the plaintiffs are illegally demanded and that they have been paid by plaintiffs, the question then is: Could they recover what was paid by the remedy now provided and is it clear and unquestionable that they could so recover?

### The Remedy at Law.

What is the remedy at law available to the plaintiffs in the event they pay the tax-

es assessed against them and should seek recovery thereof?

The Agricultural Adjustment Act (as amended) provides in section 19 (b) thereof (7 USCA § 619 (b) that: "All provisions of law, including penalties, applicable with respect to the taxes imposed by Section 600 of the Revenue Act of 1926 [sections 881 and 882 of Title 26], and the provisions of section 626 of the Revenue Act of 1932, shall, in so far as applicable and not inconsistent with the provisions of this title [chapter], be applicable in respect of taxes imposed by this title [chapter]."

Section 19 (b) thus makes available to the plaintiffs section 3220 of the Revised Statutes as amended except as that statute is limited by provisions of the Agricultural Adjustment Act. Section 3220 of the Revised Statutes, as amended (see 26 USCA § 1670 (a) (1) and note), provides: "Except as otherwise provided * * * the commissioner of internal revenue, subject to regulations prescribed by the secretary of the treasury, is authorized to remit, refund, and pay back all taxes erroneously or illegally assessed or collected, all penalties collected without authority, and all taxes that appear to be unjustly assessed or excessive in amount, or in any manner wrongfully collected * * *."

While various statutes and various provisions of the Agricultural Adjustment Act affect in some manner the remedy at law provided to one who has paid a processing tax under the Agricultural Adjustment Act, the only limitation upon the general right conferred by section 3220 with which we are here concerned is that embodied in section 21 (d) (1) of the Agricultural Adjustment Act, as added by section 30 of the Act of August 24, 1935 (7 USCA § 623 (d) (1). That section reads as follows: "No recovery, recoupment, set-off, refund, or credit shall be made or allowed of, nor shall any counterclaim be allowed for, any amount of any tax, penalty, or interest which accrued before, on, or after the date of the adoption of this amendment [August 24, 1935], under this title [chapter] (including any overpayment of such tax), unless, after a claim has been duly filed, it shall be established, in addition to all other facts required to be established, to the satisfaction of the Commissioner of Internal Revenue, and the Commissioner shall find and declare of record, after due notice by the Commissioner to such claimant and op-

portunity for hearing, that neither the claimant nor any person directly or indirectly under his control or having control over him, has, directly or indirectly, included such amount in the price of the article with respect to which it was imposed or of any article processed from the commodity with respect to which it was imposed, or passed on any part of such amount to the vendee or to any other person in any manner, or included any part of such amount in the charge or fee for processing, and that the price paid by the claimant or such person was not reduced by any part of such amount. In any judicial proceeding relating to such claim, a transcript of the hearing before the Commissioner shall be duly certified and filed as the record in the case and shall be so considered by the court. The provisions of this subsection shall not apply to any refund or credit authorized by subsection (a) or (c) of section 15 [section 615], section 16 [section 616], or section 17 [section 617] of this title, or to any refund or credit to the processor of any tax paid by him with respect to the provisions of section 317 of the Tariff Act of 1930 [section 1317 of Title 19]."

Section 3220 of the Revised Statutes and section 21 (d) (1) of the Agricultural Adjustment Act, as amended, must be read together. If the plaintiffs paid the taxes assessed against them, then they would have the right to demand the return thereof on the ground that the tax is illegal and to sue therefor. That right to sue is given them by section 3220. Section 21 (d) (1) limits their right to recovery only as to such part of the taxes paid as to which they have not been reimbursed by others. If they have passed on any part of the tax, then they cannot recover that part by the legal remedy provided in the statutes. Assuming it would be possible for the plaintiffs to show what part of the taxes paid by them had not been passed on and so ultimately borne by others, the remedy at law is not inadequate because it makes it possible for the plaintiffs to recover such part of the taxes paid as they have not collected from other persons. The decision of the Supreme Court in United States v. Jefferson Electric Manufacturing Co., 291 U. S. 386, 54 S. Ct. 443, 76 L. Ed. 859, is directly in point and fully supports this conclusion, but the underlying assumption of the Supreme Court in the opinion in that case must not be overlooked. The

court said (291 U. S. 386, loc. cit. 402, 54 S. Ct. 443, 449, 76 L. Ed. 859) that: "If the taxpayer has borne the burden of the tax, he readily can show it; and certainly there is nothing arbitrary in requiring that he make such a showing."

### Inadequate Under Facts Alleged.

Now it is alleged in the bills here that it is factually impossible for the plaintiffs to establish whether they have included the taxes paid in the prices of articles with respect to which it was imposed or of articles processed from commodities with respect to which the tax was imposed, or whether they have passed on part of the tax to vendees or other persons, and what part, if any, of the tax imposed has been included in the prices of articles sold, or what part of the tax, if any, has been passed on. These general allegations are supplemented by specific detailed allegations supporting the general allegations which otherwise might be regarded as mere conclusions. The motions to dismiss admit the truth of these allegations of fact. If the remedy at law includes a provision impossible to be complied with, then, of course, it is no remedy at all and hence falls far short of being that clear, unquestionable, and adequate remedy, the existence of which precludes resort to a court of equity.

At this point, however, learned counsel for the defendant advances the argument that if the plaintiffs cannot make proof as to what part of the tax paid by them has not been passed on to others and so cannot by the legal remedy be restored what they have lost by an illegal tax, the same fact precludes them from relief in equity. The argument is that plaintiffs are not damaged if they have passed on taxes paid by them; that the burden is upon the plaintiffs to prove they will be damaged before they can have relief in equity; that if they cannot make the proof in a proceeding at law neither can they make it in a proceeding in equity. But this plausible argument will not bear analysis.

It is true, of course, that the taxpayer may not have an injunction against the collection of an illegal tax unless he proves that he·will be damaged irreparably if he pays the tax. When, however, the tax is levied against him and in the first instance must be paid by him out of his funds, no more is incumbent on him than that he prove that the tax is illegal, that it will be paid out of his funds, and that there is no adequate remedy at law for its recovery. In the multitude of cases in which equity has enjoined the collection of illegal taxes none can be found in which the taxpayer has been required to show affirmatively that if he pays the tax, he will not include it or some part of it in the prices of commodities or services which he sells. An illustration will make more clear the thought.

The Congress has the power to levy a direct tax on property provided it is levied on states in proportion to their population. Let it be assumed that Congress, disregarding the limitation on its power, does levy a direct tax at such rates as that A, the owner of a factory, would be required by that tax to pay upon his factory an annual tax of $10,000. Let it be assumed further that no adequate remedy is provided for the recovery of the tax if it is paid. The tax is illegal. If A does pay the tax, undoubtedly he will treat it as a part of his overhead in the operation of his factory. He would include it in the calculation of the cost of manufacturing the products of that factory. Even before he has actually paid the tax he may include it, or a part of it, in the prices of products he manufactures. Certainly, however, he can maintain an action in equity to enjoin the collection of the tax without proving that he has not included or will not include it, or a part of it, in the prices of commodities he manufactures. The funds from which he will pay the tax are his funds and not the less so because they may be replenished by the sale of his products to others. He has been damaged when his money has unlawfully been taken from him and not the less so because he may make himself whole through the consummation of some contract not with the wrongdoer, but with some third person.

### Constitutional Questions.

2. Since, accepting as true the allegations of facts in plaintiffs' bills, plaintiffs do not have an adequate remedy at law to recover illegally exacted processing taxes paid by them, there remains to be ruled the second of the prime questions involved in these cases. Are the taxes demanded by the defendant illegal? Is that part of the Agricultural Adjustment Act which purports to impose them constitutional? Unless it is determined that it is not constitu-

402

tional, the motions to dismiss must be sustained.

■■■■ Every statute regularly enacted by the Congress is presumed to be constitutional. No statute is to be declared unconstitutional unless it appears beyond reasonable doubt to be so. These elementary rules must be regarded. Greater even than them is the rule that the Constitution is the supreme law of the land. The judges are sworn to decide cases in accordance with its provisions and to test challenged statutes by its terms. It is not for them to question the wisdom or the adequacy of the Constitution. They cannot disregard their oaths to support it because it was written in an earlier generation when the village blacksmith did the work now done on larger scale in great factories. Some satisfaction, however, they may have in the thought that the Magna Charta of the Republic was not written for any one generation. It was to endure for ages. Therefore, there were included in it only those essential principles of government, of justice, and of liberty which are changeless although all else may change. The principles of the Constitution no more belong to one time only than do the laws proclaimed of old on Sinai.

### Delegation of Legislative Power.

One of the great principles of the Constitution is this: That the powers of government should be divided among three branches and that none of the three should usurp the authority of the others nor surrender its authority to them. The philosopher who first formulated this principle demonstrated that only through observance of it can tyranny be avoided and the liberty of the individual preserved.

■■■■ Congress cannot surrender any part of the legislative power. The Constitution vests that power exclusively in Congress. The power to tax is a legislative power. The power to tax includes the power to say what shall be taxed, who shall pay it, what the tax shall be.

The Agricultural Adjustment Act deals with the subject of a tax on the processing of agricultural commodities. It provides that:

"There shall be levied processing taxes as hereinafter provided. When the Secretary of Agriculture determines that rental or benefit payments are to be made with respect to any basic agricultural commodity, he shall proclaim such determination, and a processing tax shall be in effect with respect to such commodity. * * * The rate of tax shall conform to the requirements of subsection (b). Such rate shall be determined by the Secretary of Agriculture as of the date the tax first takes effect, and the rate so determined shall, at such intervals as the Secretary finds necessary to effectuate the declared policy, be adjusted by him to conform to such requirements. * * *

"(b) The processing tax shall be at such rate as equals the difference between the current average farm price for the commodity and the fair exchange value of the commodity. * * *

"(c) * * * the fair exchange value of a commodity shall be the price therefor that will give the commodity the same purchasing power, with respect to articles farmers buy, as such commodity had during the base period specified in section 602; and the current average farm price and the fair exchange value shall be ascertained by the Secretary of Agriculture from available statistics of the Department of Agriculture." 7 USCA § 609 (a–c).

In addition to the powers of the Secretary of Agriculture set out in the foregoing excerpts from the act, the act confers on him various other important powers. The processing taxes do not become effective as to any commodity until the Secretary of Agriculture has determined that rental or benefit payments are to be made with respect to that commodity. The Secretary is given the power to adjust the rate of tax as to any commodity whenever he determines that such adjustment is necessary to effectuate the declared policy of the act. He is given the power also, after investigation and hearing, to adjust the rate of tax as to the processing of any given commodity when he determines that a rate in accordance with the standard fixed in the act "will cause such reduction in the quantity of the commodity or products thereof domestically consumed as to result in the accumulation of surplus stocks of the commodity or products thereof or in the depression of the farm price of the commodity." 7 USCA § 609 (b). These and other powers conferred on the Secretary by the act have the effect of making less definite the standard for determining rates set out in the act than otherwise it is. It is

not necessary, however, to consider their effect unless it is first determined that without regard to them the act does provide such a standard for determining rates as is consistent with the rule that Congress cannot delegate any part of its legislative power.

It cannot be questioned that Congress has the power to levy an excise tax on the processing of any agricultural commodity. The tax may be at any rate which Congress chooses to fix, even although it might have the effect of destroying utterly the industry engaged in the processing. It cannot be questioned that Congress can delegate to the Secretary of Agriculture the administrative duty of determining what shall be the rate charged as to the processing of a particular commodity, provided Congress sets out a definite and intelligent standard by which the determination of the actual rate is to be made. Thus Congress might levy a tax upon the processing of wheat and might provide that that tax shall be at a rate equal to the difference between the current average market price of wheat on the Chicago market on the first of January, 1930, and the first of January, 1931. Or Congress might levy a tax upon the processing of corn and provide that the rate should be as many cents per bushel as the tide rises in feet on some fixed day at some fixed place; for Congress has really fixed the rate (and the fixing of a rate is a legislative power) when it has provided a certain, definite, and intelligible standard by which the rate is to be ascertained.

What Congress cannot do is to delegate to an administrative official not only the power to fix a rate of taxation according to a standard, but also the power to prescribe the standard. Congress must prescribe the standard, and it must be a real standard, an intelligible standard, a definite standard. It must be like a yardstick which is three feet long by whomsoever it is used, not one which in the hands of one man is three feet long, in the hands of another two feet long, and in the hands of a third four feet long, elastic at the will of the individual applying it.

The standard provided for in the Agricultural Adjustment Act for the fixing of the rate on the processing of any of the commodities mentioned in the act does not satisfy the requirements here set out. To say that the rate shall be the difference between X, the current average price of a commodity, and Y, the fair exchange value of the commodity, is to provide a definite and intelligible standard only if X and Y are definitely ascertainable amounts. If either is a variable, uncertain, and speculative term, then the so-called standard is not a standard and certainly not a definite and fixed standard.

It may be conceded that what is the average farm price in the United States of a given commodity, for example, wheat, at any given time, may be determined with reasonable certainty from available statistics. Any two intelligent and experienced men, from such statistics, working independently of each other, would arrive at essentially the same figure. But certainly that cannot be said concerning the determination of what is the fair exchange value of a given agricultural commodity such as wheat.

The act defines the term "fair exchange value" as "the price therefor that will give the commodity the same purchasing power, with respect to articles farmers buy, as such commodity had during the base period." The base period is defined (on all agricultural commodities except tobacco) as the pre-war period, August, 1909, to July, 1914. It is scarcely conceivable that anything could be more indefinite and uncertain than this language. It leaves to the Secretary of Agriculture the power arbitrarily to determine what articles farmers buy. It leaves to the Secretary of Agriculture the power to select the particular time (or whether he will seek an average) during the base period of five years as to which he will determine the purchasing power in terms of articles farmers buy of agricultural commodities. One Secretary of Agriculture might well determine that the fair exchange value of wheat was one sum, and another Secretary might determine that it was an entirely different sum, greater or less. Each easily could support the result reached by statistics. It is absurd to say that that is a standard by the use of which wholly different results are reached when it is applied by different individuals.

The courts have gone far in upholding legislation by Congress which has been challenged upon the ground that it involved a delegation of legislative power. But they have never even distantly approached approval of such legislation as this when challenged on that ground. Learned counsel for the defendant cites Hampton & Co.

v. United States, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624, but any careful consideration of the opinion of the Supreme Court in that case and of the facts involved in it demonstrates how little it gives support to the legislation here in question.

The case of Hampton & Co. v. United States concerned the validity of an act of Congress giving to the President power, within fixed limits, of fixing certain tariffs. The act prescribed a definite and certain standard by which the President was to be guided. He was to fix the tariffs upon certain articles imported from foreign countries so as to equalize the costs of production between the articles in the United States and in competing foreign countries. In other words, the President was to ascertain facts quite capable of definite ascertainment (and the machinery for the ascertainment of such facts was provided in the act), and then he was to fix the tariff at the mathematical difference between the costs of production ascertained by him. Two men applying the standard thus provided necessarily would reach essentially the same results.

Hampton & Co. v. United States would constitute some support for the argument of counsel in this case if it had involved an act authorizing the President to fix the tariff on any given article at the difference between the value of that article in terms of its purchase price during a given ten-year period as measured by what manufacturers of such articles in this United States were accustomed to buy during that period, as one amount, and the cost of production abroad, as the other amount. It is scarcely to be doubted that the Supreme Court would have reached an entirely different result with such a statute.

### Retroactive "Legalization."

The Congress itself now seems to doubt the validity of the attempted delegation of authority to the Secretary—although it protests that it has no doubt—since in the amendment of August 24, 1935, it gives express ratification to and attempts to legalize the rates theretofore fixed by the Secretary. The language of the amendment is: "The taxes imposed under this title [chapter], as determined, prescribed, proclaimed and made effective by the proclamations and certificates of the Secretary of Agriculture or of the President and by the regulations of the Secretary with the approval of the President prior to the date of the adoption of this amendment, are hereby legalized and ratified, and the assessment, levy, collection, and accrual of all such taxes (together with penalties and interest with respect thereto) prior to said date are hereby legalized and ratified and confirmed as fully to all intents and purposes as if each such tax had been made effective and the rate thereof fixed specifically by prior Act of Congress. All such taxes which have accrued and remain unpaid on the date of the adoption of this amendment [August 24, 1935], shall be assessed and collected pursuant to section 19 [section 619 of this title], and to the provisions of law made applicable thereby. Nothing in this section shall be construed to import illegality to any act, determination, proclamation, certificate, or regulation of the Secretary of Agriculture or of the President done or made prior to the date of the adoption of this amendment [August 24, 1935]." (7 USCA § 623 (b).

Thus is presented the question whether Congress can "legalize" the rates which the Secretary had fixed and which were not legal when and after they were fixed by him.

In United States v. Heinszen & Co., 206 U. S. 370, 27 S. Ct. 742, 745, 51 L. Ed. 1098, 11 Ann. Cas. 688, it was ruled by the Supreme Court that Congress could ratify and so legalize tariff duties for the Philippine Islands theretofore established by the President without authority. In the opinion in that case it was said: "That where an agent, without precedent authority, has exercised, in the name of a principal, a power which the principal had the capacity to bestow, the principal may ratify and affirm the unauthorized act, and thus retroactively give it validity when rights of third persons have not intervened, is so elementary as to need but statement."

Learned counsel for plaintiffs of course do not question the force of this decision, but they contend it is inapplicable. Congress had the power, they say, in the first instance, to authorize the President to fix tariff duties for the Philippines, and therefore, under the principle stated by the Supreme Court, to ratify what he did. But Congress did not have the power, they argue, to authorize the Secretary to fix processing tax rates and therefore cannot ratify the rates he fixed; the principal cannot ratify what in the first instance it could not have authorized.

■ The argument is sound. It cannot be answered. Congress lawfully could have delegated to the President the power to legislate as to tariff rates for the insular possession of the United States (and that was the ground upon which the decision in the Heinszen Case was based), but it could not lawfully delegate to the Secretary of Agriculture the power to legislate (including the power to fix taxing rates) for the United States. Therefore, since the power of ratification by Congress is governed by the law of agency, it cannot legalize taxing rates which, in the first instance, it could not have authorized the Secretary to fix.

Legality of Rates After the Amendment.

But the amendment of August 24, 1935, speaks not only retrospectively but also prospectively. It fixes processing tax rates from the date of the "adoption" of the amendment to December 31, 1937. The language of the amendment in this connection is: "(2) In the case of wheat, cotton, field corn, hogs, peanuts, tobacco, paper, and jute, and (except as provided in paragraph (8) of this subsection) in the case of sugarcane and sugar beets, the tax on the first domestic processing of the commodity generally or for any particular use, or in the production of any designated product for any designated use, shall be levied, assessed, collected, and paid at the rate prescribed by the regulations of the Secretary of Agriculture in effect on the date of the adoption of this amendment, during the period from such date to December 31, 1937, both dates inclusive." 7 USCA § 609 (b) (2). Learned counsel for plaintiffs contend that even here there has been an unconstitutional delegation of legislative power and that, therefore, even now there are no lawful rates.

Plaintiffs' argument on this point is shortly put in the brief as follows:

"It (the amendment) provides that until that date (December 31, 1937) the tax 'shall be levied, assessed, collected and paid at the rate prescribed by the regulations of the Secretary of Agriculture in effect on the date of the adoption of this amendment.' The bill containing this provision was passed by the House of Representatives on August 14, 1935. Nine days thereafter it was signed by the President.

"The date of the President's approval of the Act is the date on which it becomes law. Gardner v. The Collector, 6 Wall. 499, 18 L. Ed. 890. It speaks, therefore, from that date. It follows that the rates of tax prescribed by the regulations of the Secretary of Agriculture to which the amended Act refers are the rates that were in force on August 24, 1935. But those rates were never seen or considered by Congress. Between the date of the passage of the Act and the date of its approval by the President and Secretary was at liberty to change and vary at will the rates prescribed in his regulations. Section 9 (b) (2) is thus a blanket approval in advance of such rates as the Secretary may choose to adopt. As such it is a plain delegation of the legislative power to lay taxes."

■ The argument scarcely is deserving of serious consideration. Surely a statute will not be held unconstitutional on any such flimsy ground. The argument ignores the elementary rule that where two constructions of a statute are possible, under the first of which it is valid and under the second of which it is not valid, the first will be followed. Certainly it can be said, within the ordinary and usual meaning of the word, that the amendment was "adopted" by the Congress when it passed the House on August 14 and the Senate on August 15. Of course, it became law only when it was approved on August 24, but the President's approval is not "adoption." That word always has been understood to refer to the legislative participation in the making of a law. If so, the whole argument of plaintiffs in this connection is without force.

Taxing for the General Welfare.

So far in this opinion I have considered only the contention that the Agricultural Adjustment Act unconstitutionally delegates legislative power in the matter of fixing taxing rates to the Secretary of Agriculture. The validity of the tax here involved is assailed, however, on yet other grounds. The chief of these is that "the imposition of a tax of the character and for the purposes presented by the Act as amended is not within the taxing power of Congress as defined by article 1, § 8 of the Constitution because the tax is for a private, as distinguished from a public purpose."

■ In these cases the old question whether Congress under section 8 of article 1 has the power to tax for the general welfare is not raised. Learned counsel for plaintiffs in the oral argument conceded that Congress has that power. I think it

has. Upon that subject I said all that I can say in Missouri Utilities Co. v. City of California et al. (D. C.) 8 F. Supp. 454.

The controversy then is reduced to this: Were these taxes levied for the general welfare? Before, however, that question is discussed, it is necessary to set out the often-stated limitation on the judicial function when such a question is presented.

In the first instance the Congress is the judge of what is for the general welfare. Judicial review of its decision is limited and narrowed to determining whether there is any reasonable ground for the conclusion reached by Congress.

This limitation on the judicial function must be kept in mind. It is as much the duty of the courts to give full recognition to and to protect the powers of Congress under the Constitution as it is to safeguard from congressional usurpation the rights of other departments of government and of states and individuals under the Constitution.

The taxes here considered were levied for the purpose of procuring funds with which to pay benefits to farmers. If there are other purposes, they are incidental. If there is camouflage, it does not conceal. Let it be said plainly, it is unquestionably the truth, the Agricultural Adjustment Act imposes taxes on processors to obtain money with which to pay so-called benefits to farmers—to compensate them for wheat they have not sowed, for corn they have not planted, for pigs that never lived to squeal. The theory is that the great farming class, hitherto "forgotten," will be so brought (or perhaps restored) to a more abundant life.

Now it cannot be said, and it is idle to contend, that what benefits so great and widespread a class of persons as the farmers of America is not for the general welfare. Whether the Agricultural Adjustment Act does benefit them may be quite debatable, but it is debatable, and if it is debatable, the debate is for Congress, not the courts. The great and priceless guaranties of the Constitution do not include a guaranty that Congress will not legislate unwisely. There are, however, powers which are not committed to any branch of government but reserved to the people.

### Other Questions Raised.

I have considered carefully still other attacks made by plaintiffs on the taxing provision of the Agricultural Adjustment Act and have reached the conclusion that they are without substantial merit.

### Summary of Conclusions Reached.

3. The conclusions reached herein are summarized as follows:

I. If the taxing provision of the Agricultural Adjustment Act is unconstitutional, then the plaintiffs, upon the facts alleged in the bills, are entitled to injunctive relief against the defendant, notwithstanding section 3224 of the Revised Statutes. [26 USCA § 1543], for the reason that they are threatened with irreparable injury and have no adequate legal remedy. It is entirely possible that the plaintiffs will not be able to prove allegations in the bills (and, which, for the present, are confessed) tending to show the inadequacy of their remedy at law.

II. The taxing provision of the Agricultural Adjustment Act is unconstitutional as to taxes levied under it prior to August 24, 1935.

III. By reason of the amendment to the Agricultural Adjustment Act of August 24, 1935, processing taxes accruing under that act after the date of the amendment are lawful and valid taxes.