584

**SANDERS et al. v. ANDREWS et al.**
Civ. A. No. 5743.

United States District Court,
W. D. Oklahoma.
May 13, 1954.

Herman J. Galloway, Washington, D. C., Dan G. Moody, Austin, Tex., John E. Marshall, Oklahoma City, Okl., and Harry O. Glasser, Enid, Okl., for plaintiff.

Robert E. Shelton, U. S. Atty., Leonard L. Ralston, Asst. U. S. Atty., Oklahoma City, Okl., Homer R. Miller, Sp. Asst. to the Atty. Gen., Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., and Andrew D. Sharpe, Sp. Asst. to the Atty. Gen., on brief), for defendant.

VAUGHT, Chief Judge.

The plaintiffs bring this action for injunctive relief restraining and enjoining the defendants (hereinafter referred to as the Government or a named agency) from enforcing certain liens against their property based upon, what plaintiffs allege, are invalid assessments of taxes, interest, penalties and jeopardy assessments; to construe a compromise settlement of a suit pending in the Court of Claims based on a contract, designated No. W–957–eng–968, between the plaintiff, Leo Sanders, and the Government for the principal construction of the Oklahoma Aircraft Assembly Plant near Oklahoma City, Oklahoma, (hereinafter referred to as the Plant); to quiet title to their real estate and personal property against said liens; and for general and special relief.

The defendants challenge the jurisdiction of this court, contending that it is an attempt upon the part of the plaintiffs to have this court determine their tax liability, and denying that this court has power to award injunctive relief because of the provisions of Section 3653 of the Internal Revenue Code, Title 26 U.S.C.A., or to enter a declaratory judgment in view of the express prohibitions contained in Section 2201, Title 28 U.S. C.A.

The jurisdiction of this court depends upon a determination of whether or not the assessments of taxes, penalties and interest herein involved were arbitrary and capricious.

In view of the issues and the contentions of the parties, it is necessary to give a full review of the situation as it has been developed by the evidence. The uncontradicated evidence discloses the following facts.

The plaintiffs, Leo Sanders and Jessie H. Sanders, are husband and wife, residing in Oklahoma City, Oklahoma. Leo Sanders is a graduate civil engineer from the University of Oklahoma and at the time of the trial had been engaged in the general contracting business in heavy construction work for about thirty years. In June, 1942, he was engaged in construction work on the Fort Supply Dam project and was near its completion, which project was under a contract with the United States through the Corps of Engineers, Department of the Army, in the Tulsa district. The district engineer, a Colonel Montgomery, asked Sanders to come to Tulsa, Oklahoma, and explained the Government's situation in connection with the construction of the Plant—that seventy six contractors had refused to bid on the project as it was considered a big undertaking. He conferred with Sanders for two or three hours, urging him to bid on the project, appealing to his patriotism. This resulted in Sanders bidding on the project, he being the only bidder finally. Negotiations followed and a contract, No. W–957–eng–968, (hereinafter referred to as the contract) was entered

into on June 6, 1942. Two days after the contract was entered into "a man from the President's office" advised Sanders that the contract had to be greatly accelerated. After the work started many changes, enlargements, expansions and demands to speed up the work were encountered which greatly added to the cost of construction, caused much confusion in the progress of the work, and resulted in many adjustments out of which grew claims for additional compensation, which were not settled until June 30, 1949, the date of a compromise settlement. The actual construction was completed in 1943. On May 17, 1949, Sanders, having claimed a balance due in the sum of $2,254,420.37, filed a petition in the Court of Claims for that amount in order to be within the statute of limitations. The Board of Contract Appeals of the War Department had made a decision to the effect that Sanders was entitled to recover on his claims and the Department of the Army was directed to determine the amount due. They were unable to do so and the suit was filed. After the suit was filed it was referred to The Attorney General, the Department of Justice (hereinafter referred to as the Department) which thereafter had charge of the case. The case was assigned to Gaines V. Palmes, a trial attorney in the Claims Division. Newell A. Clapp was then Acting Assistant Attorney General and Peyton Ford, then Deputy Attorney General. As a result of the suit, Congress appropriated $1,674,030.26 to pay Sanders' claims, which funds were made available only until June 30, 1949. Negotiations for a settlement were soon under way.

In attempting to collect the money claimed to be due under the contract, Sanders and his representatives held many conferences with the agencies of the Government in Tulsa, Oklahoma City and Washington both prior to the time the suit was filed and thereafter until the compromise settlement.

In the early part of June, Palmes, with an accountant from the Federal Bureau of Investigation, came to Oklahoma City to verify the cost figures prepared by Sanders' auditors. Palmes requested that they be permitted to examine Sanders' tax records and returns, which request was granted. Conferences covering three days were held in the office of Sanders in Oklahoma City and in the office of the United States Engineers in Tulsa. At the close of one of the conferences in Tulsa, Palmes told Sanders that he was going to have a tax problem and that he should get a good tax lawyer. The last negotiations pertaining to a settlement of the suit occurred in Washington on June 27, 28 and 29, 1949.

During the interim from the date the construction work was completed in 1943 to the date of the compromise settlement on June 30, 1949, the filing of income tax returns by Sanders posed various problems. Sanders was an old friend of the then collector of internal revenue at Oklahoma City, with whom he had many consultations with reference to filing returns for those years. *But he did file a return for each year within the time provided by law, or within the time of extensions granted.* These returns were tentative and in no sense completed returns, as he was unable to determine whether he would make a profit on the contract, or sustain a heavy loss. He explained why the returns were tentative in a letter attached thereto, or when requesting an extension. Three sample letters, addressed to the collector of internal revenue at Oklahoma City, are as follows:

Under date of December 15, 1943:

"This letter is written as a request for an extension of time in which to file my estimated income and victory tax return for 1943.

"For the last two years, I have been engaged in large War contracts with the Federal Government. During the course of these construction contracts, many changes were made and additional compensation has been requested for them. The major contracts have not been completed and final payments made. It is not known at this time whether any additional funds will be re-

ceived, except the small additional retained precentages which are now withheld and which keep the contracts alive, or whether allowances will be made on the large amounts which we have requested, and if allowances are made, it is not known the amounts of allowances. We also have large unsettled items resulting from these contracts in obligations of our own and therefore cannot determine the expense in connection therewith. One of the largest items is a backcharge by the Government of $180,000.00, which is now being considered for readjustment.

"An extension of time, without penalties, is requested from you until such time as we have action and determination by the Government as to what, if any, allowance on these matters will be made. A preliminary return on Form 1040–ES was made on September 15, 1943, without knowing the outcome on these large contracts and we still do not have that information.

"Please grant an extension of time and clearance to avoid any penalties or indication of lack of good faith on my part."

Under date of March 12, 1947, and attached to the tentative 1946 income tax return:

"The declaration of my Estimated Income Tax for 1946 has been made in the amount of $2,000.00, which amount has been paid.

"It is not possible at this time to determine the exact tax due for 1946, nor for 1945, 1944, or 1943, due to the fact that large sums of money are still due me from the Government on contracts which have not yet been closed. We do not know at this time what allowances or payments will be made by the Government on these war contracts. We also have unsettled items resulting from these contracts in obligations of our own and therefore it is impossible at this time to determine our tax.

"This letter is written to clarify and avoid any penalties due to our inability to determine any tax in addition to what we have already declared and paid. As soon as the Government determines the amount of final payments due me, I will make proper returns."

Under date of September 14, 1949:

"I am enclosing herewith Income Tax Return for the year 1948, on which payment of estimated tax was made in January 1949.

"Extension to September 15, 1949 for filing 1948 return was granted by your office; however, due to the vast amount of detailed work required in making adjustments in connection with recent settlement of amounts due me from the U. S. Government, my accountants have been unable to complete final figures by this date. As soon as figures are computed from the work now being done, amended returns will be prepared and filed."

The tentative returns for the years 1939 to 1950, inclusive, reflected the following: 1939, net income of $65,065.66 and tax liability of $13,992.98, on which the commissioner determined no penalty; 1940, net income of $40,000 and tax liability of $9,226.80, on which the commissioner determined an overassessment of $9,226.80; 1941, net income of $40,000 and tax liability of $11,382, on which the commissioner determined an overassessment of $14,202; 1942, net income of $20,000 and tax liability of $6,148, on which the commissioner determined no tax liability in the deficiency notice; 1943, no income and tax liability of $1,000 on which the commissioner determined a deficiency of $18,733.69 and penalty of $14,083.58; 1944, no income and tax liability of $2,000, on which the commissioner determined a deficiency of $1,415.73 and penalty of $353.93; 1945, no income and tax liability of $2,000, on which the commissioner determined an overassessment of $2,000; 1946, no net income and tax liability of $2,000, on which the commissioner de-

termined a deficiency of $20,785.22; 1947, no income and tax liability of $1,000, on which the commissioner determined an overassessment of $1,000; 1948, no net income and a tax liability of $100, on which the commissioner determined an overassessment of $100; 1949, no income and a tax liability of $2,000, on which the commissioner determined a deficiency of $688,710.84 and a penalty of $172,177.71; and 1950, no income and a tax liability of $100, on which the commissioner determined an overassessment of $100.

During the negotiations with the Department, Palmes suggested the figure of $940,000 as a compromise settlement. The figure finally agreed upon was $954,-100, which was effected in the following manner. Palmes dictated the following letter, addressed to the Attorney General, which Sanders signed on June 29, 1949 (Pl. Ex. 3):

"I hereby offer to accept the sum of $954,100.00, which includes bond premium of $14,100.00, in full settlement of all claims which are included in the above entitled suit and of all claims growing out of Contract W-957-eng-968 and of the construction of the Oklahoma Aircraft Assembly Plant near Oklahoma City, Oklahoma. To this should be added the payment of retained percentage in the amount of $1,001.71, making a total of $955,-101.71.

"This offer is conditioned upon payment being made before July 1, 1949 out of an appropriation now available to the Department of the Army.

"We tender herewith a Motion to Dismiss to be held in escrow and which, it is understood, will be filed upon receipt of the money by me."

The Department wrote a letter of acceptance, signed by Newell A. Clapp, Acting Assistant Attorney General, and dated June 29, 1949, as follows (Pl. Ex. 4):

"This is to inform you that your offer to compromise the above en-titled case for the sum of $954,100 (which sum includes a bond premium of $14,100), in full settlement of the claims set forth in the petition in the above entitled case and all claims growing out of contract No. W-957-eng-968, covering the construction of certain work in connection with the Oklahoma Aircraft Assembly Plant, near Oklahoma City, Oklahoma, has been accepted by the Attorney General. In addition, it is understood that there is due and owing to you the sum of $1,001.71 retained percentage withheld by the Department of the Army, which amount is not included in your claim. With respect to your request for payment of interest on the amount of your claim, please be advised that the payment of interest on claims against the United States under circumstances herein involved is expressly forbidden by statute. Hence, no interest is included in the amount stated and no interest will be paid to you on this claim.

"The Chief of Engineers, Department of the Army, has been informed of the acceptance of your offer of compromise and has been advised that payment of the sum of $955,101.71, which is understood to be available in existing appropriations, is to be made not later than June 30, 1949.

"Please be advised that the acceptance of your offer of compromise and the filing with the Court of Claims of your Motion to Dismiss the Petition, which has been furnished you to this Department to be held in escrow pending receipt by you of the amount mentioned above, covers all claims arising out of the contract whether or not they are set forth in the petition. Please advise promptly upon receipt of payment, in order that Motion to Dismiss may be filed."

The motion to dismiss the action, referred to in the above letters, read as follows (Pl Ex. 5):

"Comes now the plaintiff and shows to the Court that the plaintiff and defendant, acting through the Attorney General, have agreed upon an amount by way of compromise and settlement of all claims set forth in the petition in the above-entitled suit and of all claims growing out of Contract No. W–957–eng–968 and of the construction of the Oklahoma Aircraft Assembly Plant near Oklahoma City, Oklahoma.

"Wherefore, plaintiff moves the Court that the above-entitled suit be dismissed with prejudice."

Sanders then took a plane to Dallas, Texas, on the night of June 29, 1949, where he signed a supplemental agreement, and from there he went to Fort Worth, on June 30, 1949, where he received a check for the amount agreed upon. The supplemental agreement was prepared by Government representatives and signed by Colonel Edward G. Daly, Corps of Engineers, District Engineer Contracting Officer, and Sanders. It contained the following paragraph (Pl. Ex. 6):

"Upon payment of the above amount agreed to as a compromise settlement, and retained precentage in the amount of $1,001.71, all matters between the Contractor and the Government arising by reason of or in connection with Contract No. W–957–eng–968 will have been settled, and, the contractor hereby releases the Government from any and all claims now filed or to be filed in the future, arising from or in connection with Contract No. W–957–eng–968, as amended."

Before signing this supplemental agreement, Sanders objected to the language employed for the reason it was not sufficiently definite. Quoting from Sanders' testimony (R.64):

"Q. What was that discussion? A. The discussion was about the language 'of all matters.'

"Q. What was said to you and what was said by them, in substance? A. Well, in substance I objected to the brief statement 'of all matters', and they assured me, Mr. Carrier—I had considerable discussion with him and one or two others, that that was the most all inclusive language that you could use.

"Q. Then after those statements, did you sign it? A. I did."

Quoting from the testimony of A. C. Horn, in the Tulsa district office of the Corps of Engineers, (R.315–316–320):

"Q. Mr. Horn, did you have anything to do with the preparation of a so-called supplemental agreement dealing with the settlement of this case? A. That made the final settlement on this contract?

"Q. That is right. A. Yes, sir. It was prepared under my supervision in my office.

"Q. At whose request was that prepared? A. Well, the first notice I got on that, Mr. Palmes called me from Washington and said they had reached a settlement with Mr. Sanders, and told me the amount of it, and then I talked to Mr. Sanders in that same telephone conversation. He was in Mr. Palmes' office, and he asked me what the total amount would be and I told him it would be what they had agreed upon plus about $1,000 retained percentage, and then the Office of the Chief Engineers called and requested that we prepare a supplemental agreement to his contract providing for payment in the amount that was agreed on plus the retained percentage.

"Q. Were you informed as to what matters to include in that agreement? A. Yes.

"Q. Just answer yes or no. A. Yes.

"Q. And by whom were you given your information? A. To the best of my recollection it was Mr. Fred Johnson. * * *"
(Cross examination)

"Q. Now from who else besides Mr. Palmes did you receive instructions about this? A. From Mr. Fred Johnson, from the Office of the Chief Engineer.

"Q. And he called you? A. Yes, sir.

"Q. What did he say? A. He told me that they had reached a settlement with Mr. Sanders and the Justice Department and requested that I prepare, that our office prepare a supplemental agreement providing payment for this amount, and it was to be in full settlement of everything under the contract and the release of all the claims filed.

* * *

"Q. Where did you get the remaining information from which to draw your supplemental contract? A. They practically dictated it to me from Washington.

"Q. Who was that? A. Mr. Fred Johnson in particular.

"Q. Did Mr. Palmes also participate in that, that conversation? A. No, sir. I had talked to him before that time.

"Q. You had talked to him before you talked to Johnson? A. That is right."

All of these instruments and the actions thereunder were prepared and done hastily as the time was running out on the appropriation.

Sanders showed the collector of internal revenue his check for the compromise settlement the next day after its receipt, and told him that he thought he had settled the taxes in the settlement. Quoting from Sanders' testimony (R.369):

"Q. When you received this $900,000 in final settlement, did you submit reports thereafter for that year? A. No, sir. Immediately thereafter I went and had a conference with them and told them what we had done.

"Q. (Mr. Galloway) Who are 'they?' A. The Collector, Mr. Jones. I told him I thought I had settled the taxes on this case and on the contract, that the rest of our stuff would have to be worked over and amended and corrected and brought up to apple-pie shape.

"Q. You refer to your understanding of the settlement of the $900,000-plus? A. That it had settled everything in connection with this contract, taxes and everything else of every nature.

"Q. What was the attitude of the Collector at that time in the matter? A. He agreed with me."

On account of his failure to receive what was due him under the contract, Sanders was short of help and his bookkeeping was more or less confined to receipts and expenditures, and his office force became so burdened with details they were unable to complete what would be ordinary records. After the compromise settlement was received, Sanders employed the firm of Williams, Hurst and Groth, certified public accountants, to bring his books to date and prepare amended returns, and John E. Marshall, a tax attorney, whose advice in the legal matters concerning the preparation of said returns was followed by the auditors. The accountant was unable to get the books in condition to make complete tax returns for the years involved until the latter part of 1952.

John P. Hulsey, an internal revenue agent, was assigned to work on Sanders' tax matters and was continually pressing Sanders to file his returns. Sanders advised him that he could not file amended or complete returns until there was a settlement on the contract—that until that time he would be unable to determine whether he had a profit or a loss. Hulsey had many conferences with Sanders and his auditors concerning these tax matters, and when he learned of the compromise settlement he became insistent, which finally resulted in his recommendation on August 17, 1951 of a deficiency tax against Sanders for the years 1939 to 1944, inclusive, in the amount of $960,297.39 plus a 5% negligence penalty

in the amount of $48,038.87 and a deficiency tax of $38.58 for the year 1941 against Mrs. Sanders. (Pl. Ex. 22) Hulsey was not certain for what years the money received in the settlement should be reported, and recommended the assessment be based upon spreading the money received over the years 1939 through 1944, and therefore he charged Sanders with an income item of $250,000 a year for the years 1939 through 1944, except 1942, or a total of $1,250,000. Hulsey's reasons for making the above recommendation and his indicated basis for such computation of tax and penalty amounting to $1,008,336.26 on receipt by Sanders of the $940,000 may best be revealed by Hulsey's own testimony as follows (R. 444–446):

"Q. I am handing you a letter addressed to Leo Sanders of August 17, 1951, which purports to include a report by you for the years 1939, '40, '41, '43 and '44. That is your report, is it not? A. That is right.

"Q. Now in that I notice you recommend a deficiency tax of $960,297.39. Isn't that right? A. I think it is, yes, sir.

"Q. And you recommend a penalty of only $48,000, which is 5%. Now how do you account for that? A. I was recommending a negligence penalty. Perhaps there should have been a negligence penalty put on this because he was negligent in preparing his returns.

"Q. (By the Court) What was that? A. A negligence penalty of 5%.

"Q. (By Mr. Galloway) What do you call 25%? A. Delinquency penalty; two different penalties. May I explain this. When I couldn't get him to prepare his returns, I made this just based on an *estimate and put it in these years because he had stated that is where his income was*, back in those years when he was doing this work.

"Q. Who is 'he'? A. Mr. Sanders.

"Q. He told you that, did he? A. I got the impression from him that he made his income prior to 1945.

"Q. From him or his accountant? A. From him. *Those are just estimates, trying to wake him up.*

"Q. This was in August, 1951, and he had received this money in June of 1949? A. Yes, sir.

"Q. Or two years before, but you assessed him a 5% tax or penalty for negligence, but a year later you hit him with a 25% tax penalty, didn't you? A. Yes, sir. I hated to put that 5% on that, too.

"Q. (By the Court) Has there been any feeling between you and Sanders? A. No, sir, not until this jeopardy assessment went on, while we argued quite a bit. We tried to examine the books. We would get heated a little bit once in a while but it was in a minor way. I knew he wouldn't like it about me putting this jeopardy assessment on, but I felt like something had to be done or the Government wouldn't ever collect any tax on this. He didn't want to file a return. He was doing away with his assets—

"Q. Did it ever occur to you the course you took was rather a severe one? A. Yes, sir.

"Q. And it would destroy him absolutely eventually? A. I was afraid it would." (Emphasis supplied.)

In July, 1952, Sanders filed amended returns for the years 1939 through 1950, as prepared by his accountants and with the assistance of his tax attorney, in which the amount received from the settlement was apportioned over a term of years, at the suggestion of the collector of internal revenue. The amended returns reflected the following: 1939, net income of $103,646.58, tax liability of $34,158.87 less $13,992.98, credit for tax previously paid, leaving a balance due of $20,165.89, on which the commissioner computed a deficiency of $27,848.61, interest of September 9, 1952 of $20,861.66

and no penalty; 1940, net loss of $46,-763.07, no tax liability and a previous payment of $9,226.80, on which the commissioner determined an overassessment of $9,226.80; 1941, no taxable income, no tax liability and previous payments of $14,202 and $9,226.80, or a total of $23,-428.80, to be credited on the 1942 return, on which the commissioner determined an overassessment of $14,202; 1942, net loss of $200,636.42, no tax liability and previous payment of $6,148, plus $23,-428.80 paid for 1940 and 1941, or a total of $29,576.80 to be credited on the 1943 tax, on which the commissioner determined no taxable income and no tax; 1943, an income tax net income of $23,-785.72, a victory tax net income of $29,-128.72, a total income and victory tax of $8,966.73, with payments previously made of $29,576.80 plus $1,000 paid on the 1943 declaration of estimated tax, or a total of $30,576.80, from which deduction was made of $8,966.73, leaving an overpayment of $21,610.07, on which the commissioner determined an income tax net income of $49,315.05 and a victory tax net income of $54,658.05, a deficiency of $18,733.68 and a penalty of $14,083.58 with no credit for the 1940 and 1941 overpayments of $23,428.80; 1944, net income of $16,207.22 and tax liability of $1,201.76, with the overpayment of $21,-610.07 for 1943 and $2,000 payment on the 1944 declaration of estimated tax, or a total of $23,610.07 less the $1,201.76 tax or $22,408.31 to be credited on the 1945 estimated tax, on which the commissioner determined a taxable income of $13,060.07 or $3,147.15 less than Sanders reported, but a deficiency of $1,-415.73 and a penalty of $353.93 were determined; 1945, net loss of $52,387.30 and no tax liability, with $22,408.31 overpayment for 1944 and $2,000 payment on the 1945 declaration of estimated tax, or $24,408.31 to be credited on the 1946 estimated tax, on which the commissioner determined a loss of $48,810.79 and an overassessment of $2,000; 1946, net income of $26,033.13 and tax liability of $7,841.40, with credits of $17,566.91 overpayment for 1945 and $1,000 paid on the 1946 declaration of estimated tax, or a total of $18,566.91, leaving a sum of overpayment totaling $10,725.51, to be credited to the 1947 estimated tax, on which the commissioner determined a deficiency of $21,146.62 and a penalty of $11,345.77; 1947, net loss of $42,452.88 and no tax liability, with the overpayment of $10,725.51 and the 1947 declaration of estimated tax of $1,000 to be credited to the 1948 estimated tax, on which the commissioner determined a net loss of $34,555.87 and an overassessment of $1,000; 1948, net loss of $67,-432.18, with the 1947 overpayment of $11,725.51 and 1948 declaration of estimated tax of $100 or $11,825.51 to be credited to the 1949 estimated tax, on which the commissioner determined a loss of $70,454.12 and an overassessment of $100.

On September 10, 1952, Sanders received a jeopardy assessment against Leo and Jessie H. Sanders in the aggregate amount of $963,581.93, being income tax of $688,710.84, delinquency penalty of $172,177.71 and interest of $102,-693.38, for the year 1949, and a notice of distraint at the same time. (Pl. Ex. 7) Sanders contended that he owed no tax for 1949. He conferred with the then collector of internal revenue, H. I. Hinds, at Oklahoma City, who suggested that Sanders file a 1949 return on a capital gain basis, make payment thereon, and if no tax was owing, he would receive a refund of the amount paid. The collector, as reported by Sanders, said he thought that would solve the situation and remove the jeopardy assessment and distraint. Promptly, on September 12, 1952, Mr. and Mrs. Sanders filed an amended joint income tax return for 1949 in which they reported for taxation on the long-term capital gain basis the $940,000 received in the settlement and paid a tax of $247,-694.44 by check and credit. (Pl. Ex. 11) On October 20, 1952 the commissioner made an assessment thereon for a tax liability of $235,768.93, penalty of $58,942.-23 and interest of $35,271.68, gave a credit of $235,768.93, or a net penalty and interest of $94,213.91, and made a fur-

ther jeopardy assessment of said amount. (Pl. Ex. 13) On November 7, 1952, the commissioner assessed a penalty against the Sanders of $17,095.90 (Pl. Ex. 17), making a total of taxes, penalties and interest of $1,074,491.74. A joint return for 1950 reflected a loss of $78,278.13 and no tax liability, on which the commissioner determined a loss of $84,465.-15 and an overassessment of $100.

It can be seen how difficult it would be for Sanders to determine at any time between 1943 and 1949 whether he had income in any of those intervening years, and the filing of tentative annual returns estimating his income or loss was done at the suggestion of the collector and for the purpose of avoiding delinquency penalties. Sanders testified that up until 1949, when he made the compromise settlement, his loss was, approximately $2,-000,000, and there is no evidence that he received any income on the contract from 1943 to 1949 until he received the $940,-000.

 The principal question in this case is whether this court has jurisdiction. The defendants contend that it is an attempt on the part of the plaintiffs to have this court determine their tax liability. This court would have no jurisdiction in a purely income tax controversy, but this is not an income tax case. The mere fact that the liens claimed are for a tax lien does not deprive this court of jurisdiction. Under the statutes this court has jurisdiction in this character of case to quiet title against liens asserted if under the record it is disclosed to the satisfaction of the court that the liens are invalid or the result of arbitrary and capricious conduct.

Title 28, U.S.C.A., section 2410(a) provides:

"Under the conditions prescribed in this section and section 1444 of this title for the protection of the United States, *the United States may be named a party in any civil action or suit* in any district court, including the District Court for the Territory of Alaska, or in any State court having jurisdiction of the subject matter, *to quiet title to or for the foreclosure of a mortgage or other lien upon real or personal property on which the United States has or claims a mortgage or other lien.*"

Section 1655 provides in part:

"In an action in a district court to enforce any lien upon or claim to, or to remove any incumbrance or lien or cloud upon the title to, real or personal property within the district, where any defendant cannot be served within the State, or does not voluntarily appear, the court may order the absent defendant to appear or plead by a day certain."

The defendants contend that under Section 3653 of the Internal Revenue Code, 26 U.S.C.A. § 3653, the plaintiffs are prohibited from maintaining this character of action and by reason thereof, this court is without jurisdiction to render a judgment for a declaratory judgment or injunctive relief. Section 3653 reads in part as follows:

"(a) Tax. Except as provided in sections 272(a), 871(a) and 1012 (a), no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court."

 The courts have held in many cases that where the property rights of a taxpayer would be utterly destroyed if he be compelled to pay a tax, that is not in fact his obligation, and the remedy by a suit for recovery would not adequately restore him to that which he has lost, a court of equity will take jurisdiction to grant relief in advance of payment notwithstanding the prohibition of section 3653, supra.

In Acklin v. People's Savings Association, D.C., 293 F. 392, 394, the court gave a correct statement of the law as follows:

"While it is a settled practice, by decision of the Supreme Court in the Dupont and other cases, that the remedy of a taxpayer is in the Bureau of Internal Revenue under sec-

tion 3224 et seq., Revised Statutes, and that ordinarily he may not enjoin the collection of a tax, but must pay the tax and seek a refund in the department, nevertheless the existence of exceptional cases is recognized. Dodge v. Osborn, 240 U.S. 118, 36 S.Ct. 275, 60 L.Ed. 557; Hill v. Wallace, 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822. It is easily conceivable that there are and must be cases in which the rights and property of a taxpayer will be utterly destroyed, if he is compelled to pay an alleged tax and pursue his remedy in the department, wherefore, when the facts clearly show that the pursuit of the ordinary statutory remedy will inevitably result in such destruction, a court of equity may take jurisdiction to grant relief and to furnish an adequate remedy. This, of course, should be done only in the most extraordinary cases, for the collection of revenue necessary to the support and maintenance of the government ought not be interrupted by litigation, unless exceptional and grave conditions obtain."

In Midwest Haulers, Inc., v. Brady, Acting Collector of Internal Revenue, 6 Cir., 128 F.2d 496, 499, the court held:

"Section 3653 of the Internal Revenue Code is not an absolute bar to every action to restrain the collection of an illegal tax. (Citing authorities.) The genesis of this statute is found in Section 10 of the Act of March 2, 1867, ch. 169, 14 Stat. 475. Originally, it was an amendment of the Internal Revenue Act of July 13, 1866, ch. 184, 14 Stat. 152. The Act of which it was made a part expressly provided for a remedy at law by suit to recover taxes erroneously or illegally assessed or collected. In its present language it appeared in the Revised Statutes independently of the Revenue Act as R.S. 3224. Its original and present setting require that it be construed in pari materia with other parts of the Internal Revenue Act which give to a taxpayer the unqualified right of recovery of all that has been illegally exacted from him under the guise of a tax. Snyder v. Marks, 109 U.S. 189, 3 S.Ct. 157, 27 L.Ed. 901. When it is made to appear that the rights and property of an alleged taxpayer will be utterly destroyed if he is compelled to pay a tax that is not in fact his obligation and the pursuit of his remedy by suit for the recovery will not adequately restore to him that which he has lost, a court of equity may take jurisdiction to grant relief in advance of payment notwithstanding the prohibition in Section 3653. * * *"

And again, in John M. Hirst & Company v. Gentsch, 6 Cir., 133 F.2d 247, 248, Section 3653 was under consideration, wherein the court said:

"It has been construed in a long line of cases to withdraw from the courts the power to restrain assessment or collection of taxes where the challenge is to the validity or applicability of the tax. Its restraint is not, however, absolute, and beginning with Dodge v. Brady, 240 U.S. 122, 126, 36 S.Ct. 277, 60 L.Ed. 560, through Hill v. Wallace, 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822, and Miller v. Standard Nut Margarine Co., 284 U.S. 498, 509, 52 S.Ct. 260, 76 L.Ed. 422, an exception to the universality of its application has been recognized in cases which, though apparently within its terms, present extraordinary and entirely exceptional circumstances to make its provisions inapplicable. The latest case to sustain the jurisdiction of the court to take cognizance of a suit for injunction, is Allen, Collector v. Regents of the University, 304 U.S. 439, 448, 58 S.Ct. 980, 82 L.Ed. 1448. It must be observed, however, that the later decisions were not reached without vigorous protest by members of the present court, including the Chief Justice.

"The circumstances that are to be considered extraordinary or exceptional have never, of course, been catalogued. In Miller v. Standard Nut Margarine Co., supra, however, the fact that the collection of a tax would prove to be arbitrary and oppressive, destroy the business of the taxpayer, ruin it financially, and inflict loss for which it would have no remedy at law, was held to indicate circumstances so extraordinary and exceptional as to give jurisdictional sanction to an application for injunction restraining the collection of the tax. * * *"

It occurs to the court that if there was ever a case that would justify an exception from the contention of the defendants that Section 3653 prohibited the plaintiffs from injunctive relief the case at bar is that case.

■ Do exceptional and extraordinary circumstances exist in this case? The plaintiff did not institute negotiations to obtain the contract on the Plant. A war was in progress and the Plant was essential to the war effort. Sanders was contacted after seventy six contractors had refused to bid on the project. The government official reasoned with Sanders for two or three hours in his effort to persuade Sanders to undertake the project. Sanders' patriotism was appealed to and he yielded to that persuasion and bid on the contract. His was the only bid eventually. This was of itself an extraordinary circumstance. It was over a five million dollar contract which eventually involved over seven million. Within two days after the contract was entered into, the Government began to make changes which enlarged and expanded the undertaking. More and more speed was demanded in the construction as it progressed. This caused the contractor to become involved in many additional claims to be made, with many adjustments to be effected. In spite of what seemed to him to be insurmountable difficulties, he completed the construction within the time provided in the contract which was sometime in the year 1943. He then spent six years trying to collect what he claimed was due him in the full settlement of the contract. From the beginning of the construction until he made a final settlement on the contract he was unable to determine whether he had made a profit or sustained a loss. This resulted in his inability to file completed income tax returns for the intervening years. This is uncontradicted in the record. Quoting from the testimony of Palmes (R. 267):

"Q. Everybody has a tax problem, but the point is this: Did you indicate to him now that the amount of money that he would receive would enable him to come out whole on this contract, and while there was no profit in it for him there would be no taxes? A. No, sir, I didn't say anything about there being no taxes or anything of that sort. I knew there was some profit *the way I have calculated it,* and I felt when he filed his income tax return and showed his costs and added to the payment previously received the amount of this settlement, then he would show correctly the income or loss or whatever it may be on this particular contract. *I didn't know, and he didn't know how much money he was going to receive, so how in the world could anyone have made a determination of the amount of taxes at that time. That is what bothers me in this case."* (Emphasis supplied.)

Quoting from the testimony of Hulsey (R. 385):

"Q. (By the Court) How, as an accountant, could he determine what the profit or loss on this job would be until some settlement, some determination of the amount that was due the contractor was determined? A. Well, of course, we were not sure just what basis he was reporting on, and he indicated to us he was reporting on a completed contract basis. That would be the basis in which he would have to wait probably until he made the complete settlement, but of

course, when he did file his return he didn't file it on that basis."

The matter of attempting to settle the $2,200,000 claim of Sanders in which he had filed a suit in the Court of Claims, after it had been referred to the Department, was in charge of Palmes, who began his conferences in early June, 1949 and concluded them on June 29. The parties were in conference in Washington June 27, 28 and 29, 1949. Everybody concerned wanted to make the settlement before the appropriation expired on June 30, 1949. Sanders wanted to get the most money possible and the Government wanted to make the best compromise it could. A compromise is a give and take proposition. Under the circumstances it would be ridiculous to assume Sanders would settle for less than half the amount he claimed if he had the remotest idea it was going to be considered his profit on the contract on which income taxes, penalties and interest would be assessed in excess of the amount received. Particularly is that true when it is noted that he had been warned by Palmes in the early part of June that he probably would have a tax problem. One of the Government's witnesses, Ed E. Carrier, an attorney in charge of the legal branch of the Office of Division Engineer, testified as folllows (R. 299):

"Q. Were you present at the conference in Tulsa in June, 1949 which was attended by Mr. Palmes and by Mr. Sanders and others? A. I was.

"Q. In that conversation, was there anything said by Mr. Palmes to Mr. Sanders in connection with Federal taxes? A. I would have to relate the story and the picture as I saw it.

"Q. All right. A. That conference consisted of about two or three days. It started in Tulsa. From Tulsa it went to Oklahoma City where we had another conference. From there we went through the Bomber Plant. Then we reconvened back in Tulsa. They had a group of people in the Tulsa conference, and the claim was discussed. It is my recollection Mr. Palmes had all the claims before him or the petition before him or a paper before him, and he was going down the line discussing the items with the Government Engineers, and certain notations were made. As the conference was breaking up, Mr. Sanders asked Mr. Palmes, 'What figure do you come up with?' Mr. Palmes said, 'I don't know exactly. To me it looks like it is going to be approximately $700,000.' Mr. Sanders said, 'That will never get the job done. We will have to continue to negotiate in Washington. That is not enough.' Mr. Palmes said, 'It seems to me you should not be worrying about what this settlement is going to be. You are going to have a tax problem on your hands and what you need is a good tax lawyer.'"

This statement is corroborated. Mrs. Beatrice Davidson, administrative assistant to Sanders, testified (R. 136):

"Q. Now where again, if at all, did you see Mr. Palmes? A. I saw Mr. Palmes in Washington.

"Q. And what were you doing there? A. I had gone there for a conference with Mr. Palmes pertaining to the settlement of these items on the Oklahoma Aircraft Assembly Plant. * * *

"Q. About when was that? A. It was the week, about June 27th, 26th and 27th, 1949.

"Q. How many conferences did you attend, if you recall, at which Mr. Palmes was present? A. We were in continuous conference on Monday, Tuesday and Wednesday, Wednesday being June 29th.

"Q. Now I would like to ask you if at any of these conferences you heard Mr. Palmes mention anything about income tax. A. Yes, sir.

"Q. This was in '49, I believe? A. Yes, sir.

"Q. And what did Mr. Palmes say about income taxes? A. Mr. Palmes said that Mr. Sanders would have no income tax to pay.

"Q. And what, if anything, was said about renegotiation? A. Mr. Palmes said there would be no renegotiation of this contract."

Sanders testified with reference to the conversations with Palmes as follows (R. 47):

"Q. And what was the conversation? A. It pertained to the tax situation, the kind of tax returns I had made, whether there would be any tax involved and so forth on this contract.

"Q. What did he say and what did you say? A. He said he thought *I was extremely fortunate to be made whole* and put back in business, and that was all the obligation the Government had, that I would not have any taxes to pay, even though I had lost several years I ought to be very grateful for it. * * *

"Q. What other conversations, did you have with Mr. Palmes along that line? A. We discussed the same phase when he was trying to persuade me to accept the settlement that he was offering.

"Q. Where and about when was that? A. In his office in Washington.

"Q. About when? A. About June 27th or 28th.

"Q. Who, if anyone, do you recall as being present at that time besides you and Mr. Palmes? A. I think that Mr. Williams and Mrs. Davidson, my administrative assistant, was present, I believe.

"Q. Who was Mr. Williams? A. He is the auditor that handled all this. He and his assistants, they handled all this back work. * * *

"Q. What was the conversation? A. He said I ought not to be kicking on this settlement, that I would not have any tax to pay; wouldn't have any renegotiation and that I could take the money and go home and get in business."

Dwight Williams, the auditor, testified as follows (R. 341):

"Q. (By Mr. Galloway) I believe you testified that you were present in Washington at some of the conferences upon the negotiations for the settlement of the claims of the Aircraft Assembly Plant contract? A. I was there two days, I think.

"Q. Do you remember approximately the date? A. It was before June 30th, the latter part of June, before June 30th, because they were anxious to get this settled before the appropriation died out.

"Q. Were you present at any conference with Mr. Palmes who was the attorney representing the Government? A. Yes. That is where we had our conference.

"Q. Tell the Court what, if anything, you heard Mr. Palmes say concerning the renegotiation. A. I heard him say there would be no renegotiation of this contract. * * *

"Q. What, if anything, did you hear the Government attorney say concerning making Mr. Sanders whole on his losses on this job? A. I think, if I recall it correctly, I heard him say he didn't intend to give him any profit, that all he was going to do was to make him whole, were substantially the words he used, I think."

With reference to a conversation with Peyton Ford, Deputy Attorney General, Sanders testified (R. 54):

"Q. Tell this conversation with Mr. Ford. A. I told Mr. Ford about the matter, and he was very much irritated. He got up and walked the floor and made me a speech.

"Q. What, in substance, did he say? A. He said everything be-

tween me and the government had to be settled and washed out; that they were not going to piecemeal this matter at all; that in addition to this suit we had in the Court of Claims, in which Mr. Palmes was trying to come up with a figure, everything had to be settled. We had other claims which were not involved in that suit, and he was considerably irked about that. * * *

"Q. (By the Court) Did you say anything to him or he to you with reference to taxes in the matter? A. No, sir, taxes were not specifically discussed.

"Q. (By Mr. Galloway) Were any other items specifically discussed? A. No, sir. We just said all matters had to be washed out between us."

And quoting from the deposition of Mr. Ford (R. 250):

"Q. Did you say all claims between the parties?

"Mr. Miller: I object to that. He has answered that three or four times.

"The Court. Overruled. Exception allowed.

"The Witness. At that time we were considering other claims, possibly in this case, and other matters, I don't remember details, but I do remember saying I wanted all claims settled; I wanted this to be a final settlement, and not be reopened in any manner."

It is apparent that during the conferences there was no thought of paying Sanders a profit on his contract, but in attempting to settle his claims the thought was to "make him whole." It is also apparent that Sanders made no profit on the contract but sustained a loss. He was not "made whole." Sanders' testimony gives a picture of the true situation as follows (R. 221):

"Q. (By the Court) I think it is already in the record, but what do you estimate your profit or loss was on this main contract? A. I don't think we made any money on this contract. I have gone into a lot of that and analyzed it. I think this contract was an unprofitable venture even after the full settlement was made, and just consumed six years of my life.

"Q. What was the total amount of the contract approximately? A. It was about $5,000,000. In that the Government furnished, I think we ran it up once, two or three million dollars worth of material so it was essentially a seven or eight million dollars contract in all its aspects. They agreed to furnish certain steel, cement and materials which they just made available for me. It was a pretty big undertaking, Your Honor.

"Q. Well, if this tax claim is sustained, you would have been better off not to have accepted the $900,-000? A. Yes, sir. I would have been better off not to have worked any in my life because I haven't made as much money as it will take to pay this. I have regretted many times that I did take the contract. I was talked into it. Nobody else would take it and they appealed to me. Somebody had to do it. It had to be done even though it was a big undertaking. I certainly got kicked around as a result of it and am still getting kicked around."

It is obvious from the record that exceptional and extraordinary circumstances exist in this case.

In determining whether in the compromise settlement the taxes were discussed and either waived or settled, consideration must be given the written instruments, and if there is any ambiguity in the language thereof, the statements and conduct of the parties leading up to their execution, and the rules of law governing such situations.

■ It is fundamental that an instrument in writing will be construed most strongly against the one who prepared the instrument whenever ambiguous lan-

guage is employed. At the conclusion of the conferences between Palmes and Sanders, when it was agreed that the amount of the compromise settlement would be $940,000 plus $14,100 bond premium and $1,001.71 payment of retained percentage, or a total of $955,101.71, it was Palmes who dictated the offer containing those terms which Sanders signed (Pl.Ex. 3, supra). The Department accepted the offer in a letter signed by Newell A. Clapp, Acting Assistant Attorney General (Pl.Ex. 4, supra). The motion to dismiss the action in the Court of Claims to be held in escrow and filed upon receipt of the money by Sanders was signed by Sanders and his attorneys and approved and consented to by Clapp and Palmes (Pl.Ex. 5, supra). All of the foregoing instruments bear the date of June 29, 1949 and under date of June 30, 1949, a supplemental agreement was prepared and signed by Colonel Daly, of the Corps of Engineers, and by Sanders, wherein it was agreed that "all matters between the Contractor and the Government arising by reason of or in connection with Contract No. W. 957–eng–968 will have been settled" under the compromise settlement (Pl.Ex. 6, supra).

It is therefore apparent to the court that Sanders relied upon these various written instruments and oral statements, and that he was led to believe there would be no income tax. If the income taxes were not taken into consideration, why discuss them prior to the compromise settlement? The only reason for discussing taxes in connection with the settlement by Palmes would be to induce Sanders to settle for the $940,000, and for Sanders to rely upon the statements of Palmes as the Department's representative as being authoritative. While taxes were not specifically mentioned in these various instruments, the language is broad enough to include taxes in view of the assurances given Sanders by Palmes.

The Department had authority to settle the tax liability under Section 3761(a), Title 26 U.S.C.A., which provides:

"The Commissioner, with the approval of the Secretary, or of the Under Secretary of the Treasury, or of an Assistant Secretary of the Treasury, may compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense; and the Attorney General may compromise any such case after reference to the Department of Justice for prosecution or defense."

This statute is plain and unambiguous and if it means what it states, there can be no doubt that in the situation presented by the case at bar, Palmes had such authority which we find he did exercise. The mere fact that Ford testified that taxes were not discussed with him does not nullify the understanding had between Palmes and Sanders prior to the compromise settlement. And in this connection, it is interesting to note again Ford's statement concerning the compromise settlement: "I insisted at the time of the settlement that all claims against the Government, I mean *all the claims* by the Government against Mr. Sanders *be included in the settlement.*" What other claims could the Government possibly assert after the compromise but a claim for income taxes growing out of what it would contend to be profits on the contract?

Are the defendants estopped to deny that plaintiffs' liability for taxes was thus settled? It has been vigorously contended by Sanders that Palmes did agree that in case the compromise was effected there would be no income taxes to pay; that he had nothing to worry about and would be in an enviable situation. Palmes did have authority to compromise the Sanders claims. At that figure there was no profit realized by Sanders on the contract but he suffered a loss. It would be unjust and inequitable under the facts in this record to allow the defendants to deny now that the tax liability of Sanders growing out of the contract was settled in the compromise settlement. To what extent a settlement

embraces all matters whether mentioned or contemplated in a contract of settlement has recently been passed upon by the Court of Appeals for the Tenth Circuit in Duffy Theatres, Inc., v. Griffith Consolidated Theatres, Inc., 208 F.2d 316. Consideration of the same question was contained in an opinion by the same court in Brooker Engineering Company v. Grand River Dam Authority, 10 Cir., 144 F.2d 708.

Sanders was led to believe that the Government, in this settlement, would allow him no profit but would compromise on a basis of "making him whole." Sanders discussed this matter with different members of the Department and he was assured that upon a settlement of $940,000, all matters between him and the Government would be settled and he had a right to believe that if there was no profit, no income, there would be no income tax. When, however, the internal revenue department learned that he had received the $940,000 in this settlement, their representatives lost no time, and not only treated the $940,000 as income but, as hereinbefore stated, made an assessment of taxes, penalties and interest in a sum in excess of a million dollars.

■ The fantastic figures of the examiner making the recommendation of an assessment in excess of a million dollars when he learned that Sanders had received the $940,000 are not understandable by this court and cannot be considered in any light except as arbitrary, capricious, vindictive and punitive. The five assessments of income of $250,000 for each of the years 1939, 1940, 1941, 1943 and 1944, amounting to $1,250,000, were made the basis for determining the tax for those years, and notwithstanding the fact that Sanders did not receive the $940,000 until June 30, 1949, he was assessed a penalty for not reporting this income from 1939 to 1944—a physical impossibility. And not content with this unusual and punitive act, Sanders was charged interest on the taxes determined, based on this imaginary income for 1939 to 1944, until 1952. These speculative calculations as to the imaginary income and interest on the taxes presumed to be due for said years were made on August 7, 1951. Why a penalty for not reporting income when this income was not received until seven to twelve years later, and why an assessment of interest on taxes based upon said income when the government had this "income" in its possession until 1949? This examiner admitted on the witness stand that this assessment would ruin Sanders financially. This court is of the opinion that this government will not condone this treatment of a citizen dealing in good faith with his government.

The court concludes that it has jurisdiction of the matters involved in this action; that exceptional and extraordinary circumstances exist in this case; that the assessment of taxes, penalties and interest, and jeopardy assessment liens were arbitrary, capricious, vindictive and punitive, and that their enforcement would result in the financial ruin of Sanders.

The court further concludes that in making the compromise settlement, Sanders was led to believe by the Department's representatives that the sum of $940,000.00 would "make him whole," and did not include any profit, and if there was no profit, there was no income, and if no income, there would be no income tax.

■ The court is further of the opinion that the Department of Justice had full authority to represent the United States in this settlement, and any settlement made by the Department respecting the payment of taxes or waiving same would be binding upon the Internal Revenue Department.

The plaintiffs are entitled to a permanent injunction prohibiting the enforcement of the jeopardy assessment liens.

Findings of fact, conclusions of law and a proper form of judgment, consistent with this opinion, may be submitted within thirty days from this date.